IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. <u>3:12-cv-838</u>

\* \* \*

TEMAKO McCARTHY & VICTOR )
WILLIAMS,                )
                         )
   Co-Administrator of the    )
   Estate of La-Reko Williams, )
                         )
        Plaintiffs,       )
                         ) VIDEO CONFERENCE
v.                       ) DEPOSITION OF:
                         )
TASER INTERNATIONAL, INC., ) **KENNETH WALLENTINE**
                         )
CITY OF CHARLOTTE,       )
                         )
OFFICER MICHAEL FORBES,  )
   in his individual capacity )
   and official capacity, &  )
                         )
CHIEF RODNEY MONROE,     )
   in his individual capacity )
   and official capacity as   )
   Chief of Charlotte-Mecklenburg )
   Police Department,         )
                         )
        Defendants.       )

\* \* \*

April 2, 2014
10:06 a.m.

\* \* \*

* * *

DEPOMAXMERIT LITIGATION SERVICES
333 South Rio Grande
Salt Lake City, Utah

* * *

Dana Marie Kennedy
- Certified Shorthand Reporter -
Registered Professional Reporter

1  APPEARANCES:

2

3

4  FOR THE PLAINTIFF:      **EVERAGE LAW FIRM, PLLC**
   (Video conference)      By:  Charles Ali Everage, Esq.
5                          1800 Camden Road, Suite 104
                           Charlotte, North Carolina 28203
6

7  FOR THE DEFENDANTS      **CITY OF CHARLOTTE**
   CITY OF CHARLOTTE       By:  R. Harcourt Fulton, Esq.
8  and CHIEF RODNEY        Senior Assistant City Attorney
   MONROE:                 600 E. Fourth Street
9  (Video conference)      Charlotte, North Carolina 28202

10 FOR THE DEFENDANT       **LINCOLN DERR**
   OFFICER MICHAEL         By:  Lori R. Keeton, Esq.
11 FORBES:                 6000 Fairview Road, Suite 655
   (Video conference)      Charlotte, North Carolina 28210
12

13
   ALSO PRESENT:           LANCE HARRISON, CLVS
14

15

16

17

18

19

20

21

22

23

24

25

1               I N D E X

2

3    WITNESS              EXAMINATION BY              PAGE

4    KENNETH WALLENTINE    MR. EVERAGE                6
                          MS. KEETON                 64
5                         MR. EVERAGE                85

6                    E X H I B I T S

7

8    No. 1  Report of Kenneth R. Wallentine         6

9    No. 2  Taser X2, X3, X26, and M26 Handheld
            ECD Warnings, Instructions, and
10           Information:  Law Enforcement            17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          SALT LAKE CITY, UTAH, WEDNESDAY, APRIL 2, 2014
 2                      P R O C E E D I N G S
 3          THE VIDEOGRAPHER:  Okay.  We're on record.
 4   My name is Lance Harrison.  I'm the videographer.  The
 5   court reporter is Dana Kennedy.  We represent
 6   DepomaxMerit located in Salt Lake City, Utah.  The time
 7   of day indicated on the video screen is 10:06 a.m.
 8   mountain standard time, April 2nd, year 2014.
 9              This is the case of Temako McCarthy and
10   Victor Williams versus Taser International, Inc., City
11   of Charlotte, Officer Michael Forbes, and
12   Chief Rodney Monroe.  Civil Action No. 3:12-cv-838 in
13   the United States District Court for the Western
14   District of North Carolina, Charlotte Division.
15              Counsel will now introduce themselves, and
16   the court reporter will swear in the witness.
17              MR. EVERAGE:  Attorney Charles Ali Everage
18   representing the plaintiffs.
19              MS. KEETON:  Lori Keeton.  I represent
20   Austin Michael Forbes.
21              MR. FULTON:  Harcourt Fulton for the City of
22   Charlotte.
23                  KENNETH R. WALLENTINE,
24   having been duly sworn was examined and testified
25   as follows:
```

```
1                    EXAMINATION
2  BY MR. EVERAGE:
3     Q.  I would like to -- I'd like to introduce an
4  exhibit that I'll refer to as -- it's a 28-page exhibit.
5  It's labeled "Report of Kenneth R. Wallentine."  Do you
6  have that report in front of you, Mr. Wallentine?
7     A.  Yes, I do.
8     Q.  Is that a report that you generated?
9     A.  Well, give me a second to look at it.  This
10 appears to be a copy of a report that I wrote.
11                MR. EVERAGE:  I move to mark this as
12 Plaintiffs' Exhibit No. 1.
13                    (Whereupon Exhibit No. 1
14                    marked for identification.)
15 BY MR. EVERAGE:
16    Q.  Mr. Wallentine, does this report include all of
17 the opinions that you are prepared to testify or offer
18 in this litigation?
19    A.  It does to date, yes, sir.
20    Q.  And it is divided into four sections, A, B, C
21 and D.  Are there any additional opinions that are not
22 included in this report in those four sections?
23    A.  Well, I haven't looked at the sections so I'll
24 take your representation it's divided into four
25 sections, but the report contains everything that I'm
```

1  prepared to testify about thus far in this case.

2  Q.  Looking at pages one and two of this report, you

3  list documents, pleadings, records and reports that you

4  reviewed preparing this report; is that correct?

5  A.  That is correct.

6  Q.  Are there any additional documents, reports or

7  depositions that you reviewed in formulating your

8  opinion?

9  A.  I don't believe so.

10  Q.  Looking at page two, there are a number of

11  transcripts listed.  For example, transcript of Destiny

12  -- transcript of Destiny Franklin.  Are you referencing

13  the interview about the Shaw Police Department report of

14  Destiny Franklin?

15  A.  I believe so.  I haven't looked at that

16  transcript for over four months, but I believe that that

17  was an interview with the Police Department.

18  Q.  Were you ever provided a copy of a deposition

19  transcript of Destiny Franklin?

20  A.  I don't believe so.

21  Q.  Okay.  Were you ever provided a deposition

22  transcript of Omari Greene?

23  A.  I'm sorry.  Of who?

24  Q.  Omari Greene.

25  A.  No.  I don't believe so.

1

2      Q.   Were you ever provided any deposition transcripts

3  other than Officer Michael Forbes?

4      A.   I believe that Officer Forbes' deposition is the

5  only deposition transcript that I've seen in this case.

6      Q.   Okay.  And who provided those documents to you?

7      A.   That would have -- they would have come to me

8  through Ms. Keeton's office.

9      Q.   Starting with Section A of this -- of your

10  report, you state that Officer Forbes, uh, gave commands

11  and detained, Officer Forbes' commands the detention of

12  La-Reko Williams; is that correct?

13      A.   Are you reading on page six?

14      Q.   Yes, sir.

15      A.   Yes.  That does say that on page six.

16      Q.   Do you agree that a detention occurs any time an

17  officer stops or questions a suspect?

18      A.   As -- if you're asking my opinion on that as a

19  matter of law as an attorney and judge, I would say no,

20  I do not agree.

21      Q.   Then in this case did Forbes detain

22  La-Reko Williams when he stopped to question him?

23      A.   I'm not sure what you mean by "when he stopped to

24  question him," if that's what you said.

25      Q.   Okay.  Can you answer the question?

1      A.   No.

2      Q.   If a detention is unlawful, can a suspect resist

3   an unlawful detention with force?

4      A.   Well, I am aware of some decisions by various

5   State Supreme Courts in some states that have in

6   minority opinions expressed that view.  If you're asking

7   my opinion as an attorney or as a judge, I would

8   probably give you a different opinion.

9      Q.   If a person is detained and questioned or asked

10   what happened, does the subject have a constitutional

11   right under the Fifth Amendment which protects against

12   self-incrimination to say nothing to the officer?

13      A.   I don't believe that's consistent with the

14   majority position of decisions of the United States

15   Supreme Court, but I didn't come here prepared today to

16   present one of my courses on criminal procedure.

17      Q.   Okay.  If a subject is asked by an officer I need

18   to hear your side of the story, is the subject within

19   his rights constitutionally to say no?

20      A.   I certainly think that that is an option that --

21   I'm trying to think.  I think it's Professor Akhil Amar

22   of Harvard has expressed an opinion on that very topic,

23   and I think that's certainly within the realm of

24   possibilities.

25      Q.   Okay.  And is it within a subject's right to say

1  to an officer who asked to hear his side of the story, I

2  don't have to talk to you?

3      A.  Again, I'd give you the same answer.

4      Q.  In your review of the facts, do you agree that

5  when Forbes approached La-Reko Williams,

6  La-Reko Williams was walking in a direction away from

7  the scene?

8      A.  I believe that La-Reko Williams was walking away

9  from the officer.  I'm not sure what you mean by "the

10  scene," sir.

11      Q.  Well, you agree that he was walking away from the

12  scene -- away from the officer initially?

13      A.  Yes, sir.

14      Q.  Do you agree at some point La-Reko Williams

15  stopped walking?

16      A.  Yes.

17      Q.  Do you agree that at no time did a witness or Mr.

18  Forbes observe La-Reko Williams running away from the

19  officer?

20      A.  I -- well, that -- the question's awfully broad,

21  but based on what I've seen thus far in this case, I

22  agree with your statement.

23      Q.  And all of the documents you reviewed in this

24  file was a transcript or either a recording of a

25  conversation between La-Reko Williams and Forbes; is

1  that correct?

2      A.  I reviewed an audio recording with voices that I

3  believe that those two persons were represented on that

4  recording.

5      Q.  And in Mr. Forbes's testimony, to your knowledge,

6  he doesn't indicate during this conversation that

7  La-Reko Williams was trying to flee or was walking away

8  while this conversation was ongoing?

9      A.  I don't believe there's a statement to

10  that effect.

11      Q.  Have you heard that?

12      A.  I don't believe that there's a statement to that

13  effect on the recording that I heard, but I don't recall

14  the recording with any great specificity this morning.

15      Q.  Okay.  Do you recall in your review of the case

16  whether the Officer Forbes gave a second command to

17  La-Reko Williams to provide identification?

18      A.  To provide identification?

19      Q.  Yes.

20      A.  I believe so.  I don't recall how many commands

21  there were to identify himself.

22      Q.  Okay.  Do you know whether the command was to

23  identify himself or to produce ID?

24      A.  I don't recall, sir.

25      Q.  Do you know if Williams's belongings, which were

1  provided to the police after his death, included an ID

2  card or license?

3     A.  I -- I don't.  I remember reviewing the autopsy

4  report, sir, but I don't remember what inventory or

5  property was there.

6     Q.  Would the fact that La-Reko Williams responded

7  that he didn't have ID be an aggressive action?

8     A.  Not in and of itself, no.

9     Q.  Would the fact that he responded that he didn't

10  have ID, would that be an act of resistance or

11  noncooperation?

12     A.  Well, do you want to break that question up?

13     Q.  Okay.  If -- if La-Reko Williams was asked for

14  identification, an ID card, and he responded I don't

15  have ID, would that be an act of resistance?

16     A.  Not in and of itself, no.

17     Q.  Would you admit that La-Reko Williams was asked

18  for identification and he responded that he didn't have

19  it, would that be an act of noncooperation?

20     A.  Well, taking your hypothetical simply as

21  presented, I would say no.  I mean, that -- in and of

22  itself, no.

23     Q.  Isn't it true that Officer Forbes never asked

24  La-Reko Williams his name?

25     A.  I don't recall whether that question was asked or

1    not.

2        Q.   There isn't a law in North Carolina that you know

3    of that requires a person who isn't driving to carry any

4    type of identification, is there?

5        A.   I'm not familiar with such a statute or ordinance

6    if it exists.

7        Q.   Does a -- in North Carolina, does a subject have

8    a right to ask why he's being arrested or detained?

9        A.   I know of no juris prudence that would hold

10   otherwise in North Carolina.

11       Q.   So is that yes or you don't know?  I didn't

12   understand your answer.

13       A.   I'm not aware of any juris prudence in

14   North Carolina that would prohibit a person from asking

15   such a question.

16       Q.   Are you aware of whether there's a statute in

17   North Carolina that requires an officer statutorily to

18   inform a person why he is being detained or arrested?

19       A.   I am not.

20       Q.   And you stated earlier that you're an attorney,

21   correct?

22       A.   Yes, sir.

23       Q.   Okay.  But you're not licensed in North Carolina?

24       A.   I am not.

25       Q.   Okay.  Have you ever been admitted to practice on

1    a pro hac vice basis in North Carolina?

2        A.   I have not.

3        Q.   And are you licensed to practice in Utah?

4        A.   Yes.

5        Q.   In Section V of your report, I want to read a

6    sentence that says -- and this is on page eight (as

7    read):  "The risk of injury posed on application of the

8    Taser X26 device was minimal and was reasonable -- was

9    minimal."

10            I'll just read part of that sentence.  What do

11   you base that opinion on?

12       A.   I base that opinion on my own experience with

13   Electronic Control Devices generally, my own experience

14   with the Taser X26 Electronic Control Device, my

15   training as an instructor for Electronic Control

16   Devices, and specifically for instructing in the use of

17   the Taser X26 Electronic Control Device, as well as my

18   training and education in the world of Electronic

19   Control Devices, my review of literature, participation

20   in various seminars, empirical observations, and

21   learning from other sources.

22       Q.   Okay.  And have you conducted any scientific

23   studies on the effects of Taser applications to the

24   heart?

25       A.   I have not.

Q.  Okay.  Have you looked at any studies of whether Taser applications can affect the rhythm of the heart and cause death?

A.  I have.

Q.  Okay.  Which studies have you examined?

A.  I can't recall.  I didn't bring any files, don't have my research file here with me.  I can tell you that I have reviewed numerous studies by a number of folks in the medical field that generally address the topic that you raise.

Q.  Okay.  How recent are the studies that you reviewed?

A.  Uh, the most recent would have been probably 48 hours ago.

Q.  It was not how recently you read it, but what would be the publication?

A.  Forty-eight hours ago.

Q.  What are you referencing 48 hours ago?

A.  There's a new study published by a Dr. Mark Kroll that he sent me a copy of it.  I am assuming that the publication is -- was contemporaneous with him sending a copy to me.

Q.  Okay.  Do you know the title of that article?

A.  I -- I don't.  I didn't bring it with me.

Q.  Okay.  Are you familiar with any studies

 1   conducted by Dr. Zipes?

 2       A.   I have heard Dr. Zipes speak about a case review.

 3       Q.   Okay.  Have you read any of his published

 4   studies?

 5       A.   I'm not aware that he's published any studies.  I

 6   have read publications concerning a case review.

 7       Q.   Do you contend that in Section C that the

 8   Charlotte-Mecklenburg Police Department properly trained

 9   Officer Forbes on the use of force in the use of this

10   Electronic Control Device; is that true?

11       A.   Strikes me as something that I wrote.  Can you

12   tell me where you're reading from, sir?

13       Q.   Page 15.

14       A.   Thank you.  Yes.  It does say that on page 15.

15       Q.   And do you agree that in making that statement

16   you consider the fact that the Charlotte Police

17   Department used and implemented training and warnings

18   provided by Taser International?

19       A.   It's my understanding that the foundation, or at

20   least a significant portion of the training provided

21   by the Charlotte-Mecklenburg Police Department, did,

22   in fact, follow material, and I believe, sir, did,

23   in fact, use material provided by Taser International.

24       Q.   Okay.  And do you agree that the -- that Taser

25   safety warnings are important for officers to know and

1  understand?

2      A.  I believe that the Taser safety warnings should

3  be presented in training.

4      Q.  Okay.  Do you believe that they should be

5  presented in whole and completely?

6      A.  I'm sorry.  There was something that interrupted

7  your question, an electronic ding.  Can you repeat your

8  question, sir?

9      Q.  Do you believe that the city when presenting

10  safety warnings for Taser should be -- should do so in a

11  complete and thorough manner?

12          THE REPORTER:  In a complete and thorough

13  manner.

14          THE WITNESS:  Oh, I'm sorry.  I had

15  difficulty understanding you.  In a complete and

16  thorough manner, uh, yes.

17                  (Whereupon Exhibit No. 2

18                  marked for identification.)

19  BY MR. EVERAGE:

20      Q.  The court reporter or videographer should have a

21  document I've marked as Plaintiffs' Exhibit 2 which is a

22  Law Enforcement Report of IECD Product Safety and Health

23  Information Warning dated May 31st, 2011.  Have you ever

24  seen this document previously, Mr. Wallentine?

25      A.  I have.

1    Q.  Do you agree that it would be expected or

2 reasonable for a Police Department, such as the

3 City of Charlotte, to make sure that their officers

4 receive the training and warnings that are contained in

5 this exhibit?

6    A.  The material contained in the exhibit should, in

7 fact, be generally discussed in end user training for an

8 Electronic Control Device.

9    Q.  I would like to mark this as Exhibit 2.

10    A.  And it has been already, sir.  I've got a copy in

11 front of me that is marked as deposition Exhibit 2.

12    Q.  Looking at page four of the exhibit, is there a

13 -- do you agree that there should be a warning given to

14 officers to minimize repeated exposures to ECD

15 deployments?

16    A.  Yes.  That is part of the prescribed warning and

17 should be part of training discussion.

18    Q.  Do you agree that ECD users should use the lowest

19 number of EDC [sic] exposures to a subject?

20    A.  I believe that the least amount of Electronic

21 Control Device exposure should be used to achieve the

22 objective, yes.

23    Q.  And do you also agree that after each application

24 or use of a Taser, the user, in this case the officer,

25 should reassess the subject's behaviors, reactions, and

 1  resistance level before reinitiating a Taser deployment?

 2      A.  Yes.

 3      Q.  Do you agree that if the subject is noncompliant

 4  after a number of ECD exposures consideration by the

 5  officer should be given to consider an alternative use

 6  of force?

 7      A.  Yeah.  Yes, I do.

 8      Q.  Do you agree that the officer is only authorized

 9  to use an additional application of the Taser if there

10  is an imminent threat?

11      A.  Well, that's -- that's a fairly complex question,

12  but if you're asking with respect to the broad, general

13  answer, I'd have to say no.

14      Q.  So your opinion is that a Taser can be used if

15  the subject does not present an imminent threat?

16      A.  Well, you asked an exceedingly broad question,

17  and I gave you an exceedingly broad answer.  You're

18  asking the same question again so I'm going to give you

19  the same broad answer.

20          Insofar as you're asking an overarching umbrella

21  question asking for an overarching umbrella answer, the

22  answer is yes.

23      Q.  Do you know whether the City of Charlotte's

24  policy allows officers to use Tasers if there is not an

25  imminent threat?

1    A.  Generally, the use of an Electronic Control

2  Device without some form of threat -- you've not defined

3  that at all -- without some form of threat would be

4  contraindicated.

5    Q.  What do you mean when you say I haven't defined

6  it?  Is imminent threat, is that a sufficient term of

7  definition?

8    A.  Well, it's certainly subject -- a term that is

9  subject to various gradients and also calls I think --

10  asks for the question of imminency as perceived at what

11  point, in the 20/20 hindsight of the comfort of a

12  deposition room?

13    Q.  Do you believe that a policy that uses only the

14  terminology "imminent threat" is insufficient in

15  informing the officer of when Tasers should be used?

16    A.  If that's the only term in the abstract, then

17  yes.

18    Q.  Do you agree, and I think the warning says this

19  on the same page, page four, that a Drive-Stun Mode is

20  usually only for pain compliance only?

21    A.  I agree that the touch mode of an Electronic

22  Control Device generally, although not exclusively and

23  not consistently, achieves distraction or pain

24  compliance only and does not generally, although it does

25  in some circumstances, cause neuromuscular

1  incapacitation.

2     Q.  Do you agree that this warning produced by Taser

3  warns against striking sensitive body parts as being

4  hazardous?  As being a hazard?  Excuse me.

5            THE WITNESS:  As being?

6            THE REPORTER:  As being a hazard.

7            THE WITNESS:  Oh, okay.  I haven't reviewed

8  the warning recently, but I am familiar that

9  Taser International in its training material does,

10  in fact, caution against intentional targeting of

11  sensitive body parts.

12  BY MR. EVERAGE:

13     Q.  Do you agree that this Taser training or this

14  Taser warning states that the preferred target area for

15  a frontal shot is the lower center mass below the chest,

16  below chest?

17     A.  The -- again, I haven't reviewed this, but I can

18  tell you just based on my understanding of the training

19  material and Taser's warnings generally is that if there

20  is a -- the necessity for a frontal shot that the lower

21  center of mass, I think you said the lower chest area,

22  is preferred over a higher targeting area.

23     Q.  Well, why don't you just take a second and look

24  at it.  It's right at the center of page four, and I

25  want to make sure that I'm saying it right and that

1  you're saying it right, and just read the sentence that

2  refers to the preferred target areas?

3      A.   Sure.   Yeah.   I see a section marked "sensitive

4  body part hazard" which does, in fact, state, which I

5  think is what I just said, that the preferred -- among

6  the preferred target areas is the lower center mass

7  below the chest for frontal shots, and that is

8  consistent with my understanding.

9      Q.   And do you agree that this warning further states

10  in the next sentence (as read):  "The preferred target

11  areas increase dart-to-heart safety margin distance"?

12      A.   That is correct.

13      Q.   And what is your understanding of the

14  dart-to-heart safety margin distance?

15      A.   Well, that distance refers to the -- the

16  proximity to the heart muscle of the tip of the Taser

17  probe through which the electronic current is delivered,

18  and there is some discussion in the scientific community

19  about concerns for cardiac injury with a very short

20  dart-to-heart distance.

21      Q.   And, in fact, the warning further states in a

22  footnote (as read):  "Proximity of the ECD, electronic

23  electrical discharge to, or across, the heart has been

24  identified as a principal concern for ECD caused cardiac

25  risks and safety."

1      Do you agree that that warning is clear and in

2  the warning provided by Taser?

3     A.   It is.

4     Q.   And do you agree that that warning should be

5  communicated by reasonable Police Department to its

6  officers?

7     A.   I believe that the Police Department should

8  present these warnings in the context of the training

9  for the end user prior to certification for use of the

10  Taser device.

11     Q.   Do you agree that a department explaining the

12  effect -- the possible effect on the heart of a Taser

13  application is reasonable?  Let me strike that.  Let me

14  restart that.

15      Do you believe that a department should educate

16  and explain to its officers the possible effect of a

17  Taser application on a subject's heart?

18     A.   I think that the department should provide

19  warnings and should provide training on the preferred

20  targeting areas.

21     Q.   Do you think that if a off- -- that if a

22  department advised the police officers that it was

23  training of the preferred area but did not advise the

24  police officers of the cardiac -- cardiac risks and that

25  potential danger that they did an inadequate job in

1    training?

2        A.   Well, I -- I don't know that you'd have -- you

3    could have a discussion of preferred targeting areas

4    talking about avoiding the heart and not have some

5    discussion of the risk.

6            So, if that were the case, if your hypothetical

7    were true to the case, then it would be a little bit

8    like telling someone don't do this and not giving the

9    explanation as to why they shouldn't.

10           And I suppose that it's adequate to tell someone

11   they shouldn't do it without explaining, but the

12   preferred approach would be to provide training on the

13   warning.

14       Q.   Okay.  And I just wanted to go over some things

15   and make sure that they're not in your report or ask you

16   if they were.  Does your report or opinion address

17   whether -- whether it was appropriate for an officer to

18   use a Taser in Drive-Stun Mode against La-Reko Williams?

19       A.   My report does not talk about touch mode

20   application, no.

21       Q.   Your report and opinion, does it not address

22   whether it was appropriate for an officer to cut off his

23   recording device in the middle of an incident in which

24   the officer is using force?

25       A.   I do not discuss an officer cutting off a

1    recording device, no.

2        Q.   Did you review any documents related to the death

3    of Darryl Turner after he was tased by a

4    Charlotte-Mecklenburg Police Department officer prior

5    to La-Reko Williams?  Completely separate event.

6        A.   I have.

7        Q.   Okay.  What documents did you review?

8        A.   I don't recall.  That review was not in

9    conjunction with preparing a report or evaluating

10   documents sent to me in this -- to review in this

11   particular case.

12       Q.   Was it in relation to another case, or was it

13   just something you did independently?

14       A.   It was not in connection with a case.  I made a

15   presentation quite sometime ago and in the course of

16   researching that presentation came across a report, and

17   I'd forgotten the name Darryl, but I'm confident the

18   last name was Turner.  So I reviewed some material, but

19   it had nothing to do with this case.

20       Q.   Okay.  And you said that you were making a

21   presentation?

22       A.   That's correct.

23       Q.   And you researched it?  Do you recall where you

24   were presenting in your topic?

25       A.   I believe that it was -- I believe that it was in

Chicago, Illinois, and I was chairing a panel discussion

of contemporary topics and use of force.  That's not the

precise title for the panel.  I don't recall the exact

title.

Q.  Do you recall the organization at which -- or

conference at which the presentation was given?

A.  I do.

Q.  What -- can you identify that?

A.  That was the conference of the International

Association of Chiefs of Police.

Q.  And do you recall the year?

A.  I -- I do not.  It's been within the last five --

five years or so.

Q.  When you did your presentation, was the

Darryl Turner case, was it referenced at all?

A.  I don't believe so.

Q.  But has Ms. Keeton or no member of the defense

counsel has provided you with any video or documentation

related to the death of Darryl Turner which also

occurred in Charlotte?

A.  No.

Q.  I'm sorry.  My volume wasn't working.  Did you

say yes?

A.  No.  I said no.

Q.  Okay.  No.  Did your report or opinions cover the

1    issue of whether the Charlotte-Mecklenburg Police

2    Department modified or should have modified or augmented

3    its training after the death of Darryl Turner?

4        A.   I don't -- I don't believe so.  Mr. Everage, I

5    don't -- hadn't thought about the case and -- for

6    sometime until you brought it up here this morning.

7        Q.   And the defense counsel hasn't shared that with

8    you as far as any autopsy of Darryl Turner?

9        A.   I don't believe that I've ever seen his autopsy

10   report, no.

11       Q.   Or the video of Darryl Turner and his interaction

12   with the Charlotte-Mecklenburg police officer?

13       A.   If I saw that, it certainly wasn't -- it wasn't

14   contemporaneous with my work in this case, and I don't

15   recall seeing it.

16       Q.   And defense counsel hasn't provided you with a

17   media statement police -- released by the Chief of

18   Police regarding the death of Darryl Turner?

19       A.   No.

20       Q.   Looking at some of the facts related in your

21   report, you've identified Khalilah Brown as

22   Mr. Williams' former girlfriend.  Do you recall where

23   you obtained that information or that fact from?

24       A.   I do not.  I don't.  I'm not sure where I learned

25   of her relationship, whether -- and I don't remember

1  where I learned the quality of her relationship with

2  Mr. Williams.

3      Q.  Okay.  And you haven't reviewed Ms. Browns's --

4  Ms. Brown's deposition?

5      A.  You say I have?

6      Q.  I'm asking -- I thought you had answered earlier

7  that you had not --

8      A.  No.

9      Q.  -- reviewed --

10     A.  That's correct.

11     Q.  -- the deposition?

12     A.  That's correct, I have not.  I'm sorry.  I

13 thought you said that I had reviewed it.  I'm not even

14 aware whether her deposition has been taken or not.

15     Q.  And, likewise, you're not -- you haven't been

16 provided with the deposition testimony of

17 Destiny Franklin?

18     A.  That's correct.

19     Q.  In your report it states that Williams

20 immediately picked up a bag and turned away from

21 Officer Forbes and walked away.  Where did you get that

22 information from factually that he picked up -- that

23 La-Reko Williams picked up a bag?

24     A.  I don't recall writing that, and I don't recall

25 where I obtained that information if, in fact, I wrote

1   that.

2   Q.  Are you aware of the fact that Officer Forbes

3   testified in his deposition that the presence of a bag

4   was not a factor he considered in using force?

5   A.  I don't recall that.

6   Q.  Do you state anyplace this in quotation marks

7   looking at page four of your report (as read):

8   "Williams was acting, quote, 'very aggressive,' quote,

9   towards Officer Forbes."

10      The quotations, are you quoting a particular

11  source, or are you using the quotations to emphasize

12  merely?

13  A.  It would not be my typical fashion to use

14  quotation marks as emphatic indicators.  Um, I don't

15  recall whether I read that -- that description somewhere

16  or not.

17  Q.  Looking again at the facts on page four, I'll

18  read part of this sentence (as read):  "As he again

19  grasped Williams' left hand, Officer Forbes told

20  Williams to put his hands behind his back."

21      Are you contending that that statement occurred

22  prior to any Taser application that Officer Forbes told

23  Williams to put his hands behind his back?

24  A.  That is my understanding.

25  Q.  Okay.  And where do you gain that understanding

1 from?

2  A. That -- I don't recall the specific source, but,

3 again, as you've pointed out, I did have access to

4 Officer Forbes' deposition, to the various police

5 reports, as well.

6  Q. Did you ever talk with Officer Forbes personally?

7  A. I did not.

8  Q. Or by phone?

9  A. No, sir.

10  Q. By e-mail?

11  A. Uh, no, I did not.  I don't -- let me just review

12 page two, but I don't believe I've ever spoken or

13 communicated directly with Officer Forbes.  No, I don't

14 think I have.

15  Q. Do you know if the audio recording by

16 Officer Forbes indicates that Forbes advised

17 La-Reko Williams to put his hands behind his back before

18 Forbes activated the first deployment of the Taser?

19  A. I don't recall whether I heard that or not, sir.

20  Q. Again, on page five it reads (as read):

21 "Officer Forbes drew his Taser X26 and told Williams to

22 put his hands behind his back warning Williams that he

23 would fire the Taser."

24   Is your -- is it -- are you factually contending

25 that Forbes advised Williams to place his hands behind

1  his back before the first Taser application?

2      A.  That is my understanding.

3      Q.  If the testimony from Mr. Forbes and the audio

4  from Mr. Forbes did not evidence the fact that he gave

5  the command to place his hands behind his back prior to

6  implementing the first Taser strike, would your opinion

7  change in any way?

8      A.  It would not.

9      Q.  Williams -- he alleged that Williams clinched his

10  fists, and then you state (as read):  "Comma, not

11  complying with the order to put his hands in a position

12  for handcuffing and control."

13      Where did you obtain the fact, or what's your

14  basis for saying, that Williams clinched his fists?

15      A.  Uh, the documents that are listed on pages one

16  and two of my report.

17      Q.  And do you consider it a material fact that

18  Williams failed to put his hands in a position for

19  handcuffing and control prior to the first Taser

20  application?

21      A.  It's certainly something that I would consider.

22  I'm not -- insofar as whether it's material or not as a

23  matter of law, I don't know that I'm prepared to say

24  that.

25      Q.  But it's something that you considered?

1    A.  It -- it is.

2    Q.  And do you contend La-Reko Williams, prior to

3 being tasered, should have put his hands in a position

4 for handcuffing and control?

5    A.  I contend that the optimal response for

6 Mr. Williams would have been to, first off, not commit

7 any crime and not commit an assault and not engage in

8 behavior that necessitated involvement of the police,

9 but by the time Officer Forbes showed up, optimally

10 Mr. Williams should have complied with Officer Forbes'

11 directions.

12    Q.  My question was not answered so let me re-ask it

13 again.  Do you contend that it is a significant fact

14 that Williams did not put his hands in a position for

15 handcuffing and control prior to being tasered?

16    A.  Certainly not as significant as other -- the

17 other things that I just mentioned to you.

18    Q.  Do you know what specific command was given by

19 Officer Forbes as regarding placing his hands in a

20 handcuffing position?

21    A.  I don't recall.  And, Mr. Everage, I would note

22 that we've been going a little more than an hour so when

23 you're at a point that you can take a break.  I'm not

24 tracking your water consumption, but I am mine so I --

25 whenever it's comfortable for you.

```
 1              MR. EVERAGE:  We'll take a break for five

 2   minutes.  You want to just agree to come back on the

 3   record at 1:10?

 4              THE WITNESS:  Sure.  Yeah, your time.

 5              MR. EVERAGE:  Not 1:10, but it would be

 6   11:10 for you, right?

 7              THE WITNESS:  Yes.

 8              THE VIDEOGRAPHER:  Going off record.  The

 9   time is 11:03.

10              (Whereupon a recess was taken.)

11              THE VIDEOGRAPHER:  Okay.  We're back on

12   record.  The time is 11:17.

13   BY MR. EVERAGE:

14      Q.  Um, on page five of your report, this is the

15   summation of the facts, you state that after

16   La-Reko Williams was initially failed -- initially

17   struck with a Taser he fell to the ground, correct?

18      A.  I'm -- yes.  I don't see where you're reading,

19   but that's -- that's correct.

20      Q.  Okay.  And do you state a couple times in your

21   report that while on the ground La-Reko Williams sat up

22   and tried to stand?  Is that your understanding of the

23   facts?

24      A.  Yes.

25      Q.  What evidence do you rely on to conclude the fact
```

1  that La-Reko Williams was trying to stand?

2      A.   The materials and statements that I reviewed that

3  are listed on page two of my report.

4      Q.   Do you know if any of the witnesses testified as

5  to the position of La-Reko's feet while he was on the

6  ground?

7      A.   I don't recall.

8      Q.   Do you know if any of the witnesses testified to

9  the position of La-Reko's legs while on the ground?

10     A.   No.  I don't recall.

11     Q.   Do you recall anything other than the fact that

12  Officer Forbes alleged that La-Reko Williams was

13  attempting to stand?

14     A.   I don't recall whether any other witness made

15  that statement or not, sir.

16     Q.   Do you know or recall what specific description

17  Officer Forbes provided in explaining his assessment

18  that La-Reko Williams was attempting to stand?

19     A.   I do not.

20     Q.   If Officer Forbes testified that

21  La-Reko Williams, while on the ground, his legs were

22  flat and extended out from him, would you consider that

23  a imminent threat?

24     A.   Well, certainly someone who is on the ground with

25  flat, extended legs, they could certainly be a

1    significant imminent threat.

2       Q.   In what way?

3       A.   Well, I -- you noticed that I hesitated for just

4    a minute, and it's because it just came to mind a

5    situation in which an officer approached someone in that

6    position who very quickly, without warning and with a

7    great deal of force, kicked the officer delivering a

8    crippling blow.  That's one example.  That's what came

9    to mind when you asked that question.  I don't know why.

10   It just did.

11      Q.   Did Officer Forbes indicate in any way that

12   La-Reko Williams attempted to kick him?

13      A.   I don't believe so.

14      Q.   Did Officer Forbes indicate in any of his

15   testimony or statements that La-Reko Williams punched

16   him?

17      A.   I don't recall that.

18      Q.   Did -- uh, did -- are you aware of any testimony

19   or statements from any witnesses, including Mr. Forbes,

20   that La-Reko Williams was in the -- was actually

21   elevating himself or raising his butt off the ground

22   when the strike was delivered -- when the second Taser

23   application was delivered?

24      A.   I don't recall a statement to that effect.

25      Q.   Have you reviewed the deposition of Dr. Gullagu

1   of the Medical Examiner's Office?

2     A.  Of who?  I'm sorry.

3     Q.  There is a Dr. Gullagu, who is a physician in the

4   Mecklenburg County Medical Examiner's Office.  Have you

5   reviewed his deposition?

6     A.  I have not.  And for the benefit of our very able

7   court reporter, perhaps you could spell that name

8   because it's not one that's familiar to me.

9     Q.  I will spell it into the record.  I think it's

10   G-u-l-l-a-g-u, if I'm not mistaken.

11     A.  Thank you.

12     Q.  When Officer Forbes arrived at the scene, did he

13   see La-Reko Williams strike the female,

14   Destiny Franklin?

15     A.  After he arrived or as he's driving up?

16     Q.  At any point on the scene did Officer Forbes

17   physically observe La-Reko Williams strike

18   Destiny Franklin?

19     A.  I don't recall at what point he -- he's out of

20   the car and on the scene.

21     Q.  At any point did Officer Forbes observe either

22   Ms. Franklin or La-Reko Williams on the ground?

23     A.  I -- I --

24     Q.  Let me rephrase that.  Let me rephrase that

25   before you answer it.  At any point in time before

1  Officer Forbes administered his Taser, did he observe

2  La-Reko Williams or Destiny Franklin on the ground?

3     A.  I don't believe so, but I'd have to go back and

4  look at the reports.  I don't recall that.

5     Q.  At any point in time did Officer Forbes observe

6  La-Reko Williams bashing the head of Destiny Franklin

7  into the ground?

8     A.  Into the ground or the phone pole?  I don't

9  recall that, sir.

10     Q.  Okay.  Did -- at any point in time did

11  Officer Forbes observe La-Reko Williams push

12  Destiny Franklin into a -- into a pole?

13     A.  I don't recall whether Officer Forbes received

14  that information from a third party or from -- whether

15  that's something he saw or whether he received that

16  information from Ms. Franklin.

17     Q.  And do you agree that as Mr. Forbes -- as

18  Officer Forbes approached, La-Reko Williams and Franklin

19  separated from each other?

20     A.  I believe that to be the case, yes.

21     Q.  And on page eight of the report, Section B-1, you

22  state -- and I'll just read a sentence (as read):  "A

23  reasonable, well-trained officer would have recognized

24  that an alternative force option was appropriate."

25         Can you provide some examples of alternative

1  force options that would have been appropriate?

2      A.  Well, an Electronic Control Device would

3  certainly be one of them.

4      Q.  Any other alternatives?

5      A.  Well, I don't know what other alternative options

6  were available to Officer Forbes at that moment in time,

7  but certainly there were other -- other tools that could

8  have been considered, such as there could have been

9  consideration of an oleo resin capsicum spray, some

10  other chemical tool, some form of an impact tool.

11      Q.  And with an impact tool, are you referring to a

12  baton?

13      A.  Well, either a -- yes.  Either a baton or a

14  collapsible baton or a baton-like tool.

15      Q.  And at this point in time Forbes had used the

16  Empty-Hand technique, correct?

17      A.  He had attempted to control Williams by using

18  Empty-Hand techniques, yes.

19      Q.  And after the unsuccessful attempt of the

20  Empty-Hand technique, was there any evidence that

21  Williams charged Officer Forbes?

22      A.  I don't believe so.

23      Q.  Was there any evidence that Williams -- that

24  Williams threw a punch at Officer Forbes?

25      A.  No.  I don't recall that.

1    Q.   Is there any evidence that at that point in time

2    Williams attempted to flee?

3    A.   Well, Mr. Williams clearly was not obeying

4    commands to stop and speak with Officer Forbes.  He

5    wasn't running.

6    Q.   So he was speaking with Officer Forbes, correct?

7    A.   He was speaking, yes.

8    Q.   Okay.  And he wasn't required to give a statement

9    to Officer Forbes if he didn't want to talk to him, was

10   he?

11   A.   Well, I guess that goes back to your questions

12   about whether you want me to opine as a lawyer and offer

13   an opinion of law, but, generally, no.

14   Q.   And at this point in time Officer Forbes did not

15   advise La-Reko Williams that he was under arrest.  Would

16   you agree with that statement?

17   A.   I believe that's accurate.

18   Q.   And on page -- also, on I guess it's Section B-2,

19   it says (as read):  "Use of an Electronic Control

20   Device, such as the Advanced TASER X26 device, that was

21   used by Officer Forbes is often indicated in cases of a

22   noncompliant subject demonstrates a willingness to solve

23   others."

24        Do you contend that the Taser X26 is a viable

25   option to compel compliance?

1    A.  To compel compliance with what?

2    Q.  With officer commands.

3    A.  Well, there's a number of factors that enter into

4    whether a person is going to comply with officer

5    commands or not, but, certainly some people may choose

6    to comply once an Electronic Control Device is applied.

7    Q.  Do you know if pursuant to Charlotte-Mecklenburg

8    Police Department policies whether it is allowed to use

9    a Taser solely to require compliance by a noncompliant

10   subject?

11   A.  Well, you don't -- you haven't provided the

12   policies here for me today so I can't review or refer to

13   a specific policy, but my recollection would be that

14   that's not consistent with Charlotte-Mecklenburg Police

15   Department policy.

16   Q.  So the officer has to be placed in more than a

17   situation of a subject that is merely noncompliant in

18   order to lawfully use his Taser pursuant to extending

19   Charlotte policy?

20   A.  Are you asking if that's my understanding of the

21   policy?

22   Q.  Yes.

23   A.  It sounds like you're reading from a document

24   that I don't have, but that -- that sounds generally

25   consistent.

1    Q.  In Section B-3 of your report, and I'm just going

2  to paraphrase, you contend that the Taser relies on

3  causing loss of neuromuscular control and the subject's

4  ability to perform coordinated actions.  Is that how you

5  contend the Taser works?

6    A.  That's an accurate statement of something I've

7  said before, and I think I wrote that here.

8    Q.  And do you also agree that the electric -- the

9  electric current from a Taser causes a person's muscles

10  to tense up and become rigid?

11    A.  Well, the -- that's certainly one -- that's

12  certainly one possible effect.

13    Q.  Is another possible effect that the subject loses

14  temporary control of certain muscle functions that are

15  affected by the Taser?

16    A.  Assuming that a proper circuit is achieved, it is

17  typically the outcome that a person loses volitional

18  neuromuscular control.

19    Q.  Volitional means they have the ability to control

20  their muscle functions, correct?

21    A.  Yes.

22    Q.  Looking at Section B-4 on page 10 of your report.

23  You mention that police officers are taught, and you

24  list several things regarding the general safety of

25  Tasers, and one of the factors that you listed is the

1   deployment history in numerous public safety agencies.

2       Do you agree that that is one of your factors of

3   consideration as far as Taser training?

4       A.  I agree that Taser training generally includes a

5   discussion of the deployment history of the use of the

6   Taser ECD.

7       Q.  And do you think that the deployment history of

8   Tasers is something that should be discussed when

9   considering the general safety of Taser usage by

10  officers?

11      A.  Well, I don't know that I am prepared to opine on

12  whether it should be or not.  That's something I really

13  haven't given a lot of consideration to.  I can just

14  tell you that's typically something that is included and

15  has been for many, many years in Taser end user courses

16  as long -- as well as end user courses for other

17  Electronic Control Devices.

18      Q.  Do you agree that it would be prudent for a

19  Police Department to document its history of Taser

20  deployments in relation to injuries and risk to

21  subjects?

22      A.  Well, I think that's certainly something that an

23  agency's risk management folks might want to take a look

24  at.

25      Q.  And you stated earlier that you weren't provided

1  by defense counsel any of the documentation related to

2  the Taser death of Darryl Turner that also occurred in

3  Charlotte, correct?

4     A.  I don't believe that defense counsel gave me

5  anything connected with the death of Mr. Turner.

6     Q.  And you document in your report that

7  Officer Forbes received training from the

8  City of Charlotte for large Taser usage, correct?

9     A.  Correct.

10    Q.  And reading from page 10 extending to page 11,

11 your report concludes (as read):  "However, officers are

12 also taught that there has never been a death that has

13 been scientifically demonstrated to have been caused by

14 the application of the Taser device."

15        Is that something that's in Tasers training?

16    A.  I'd have to go -- to answer that question, I'd

17 have to take a look at their current -- current training

18 materials, and I don't have that here today with me.

19    Q.  That statement that's in your report, what is

20 your basis of -- for a reference point for making that

21 conclusion?

22    A.  I've been in a number of training seminars and a

23 number of sessions where that statement has been made,

24 and I'm familiar with, as we mentioned before, many,

25 many published studies by medical professionals and

professionals in the law enforcement training world that
have taught that.

Q. Do you -- but you're not a medical doctor?

A. I am not.

Q. And you're not a pathologist?

A. No.

Q. And do you contend that Charlotte police officers
are being taught that there's never been a death
scientifically demonstrated to have been caused by the
application of a Taser?

A. I don't know whether the officers are told --
given that particular statement or not, sir.

Q. Do you know whether the autopsy performed by the
Mecklenburg Medical Examiner's Office in Charlotte,
North Carolina of Darryl Turner indicated that his death
was related to a Taser use?

A. I -- I don't know whether there was some
relational discussion or not.

Q. And do you know whether the Chief of Police put
out a media statement stating that the death of
Darryl Turner was caused by the use of an ECD?

A. I do not know that that statement was made.

Q. If a local Medical Examiner and the Charlotte
Police Department acknowledged to the media that there
was a relation between a Taser application and the death

     1    of Darryl Turner, would it be prudent for the Charlotte

     2    Police Department to communicate it to its officers in

     3    its training?

     4        A.  Well, first, I don't know that that statement was

     5    made and would be a little bit surprised if it was

     6    because I suspect that the Medical Examiner would have a

     7    fairly good understanding of the concept of causation

     8    and would certainly understand that coincidence and

     9    proximity are very distinct concepts from causation.

    10            So I don't know that the premise that you state

    11    in your hypothetical is accurate or not, and, if it were

    12    accurate, I also don't know that there's the

    13    extrapolation that can fairly be drawn there.  So I

    14    don't know that -- I don't know that your hypothesis is

    15    undergirded by fact.

    16        Q.  Well, I'm not asking you to undergird my

    17    hypothesis.  What I'm asking you to do is examine these

    18    facts hypothetically if the Chief of Police stated in a

    19    media disclosure that the death of Darryl Turner was

    20    caused by a Taser and the same -- the Medical Examiner

    21    investigating the same death indicated that

    22    Mr. Darryl Turner's death was related to ECD usage,

    23    should the Charlotte-Mecklenburg Police Department

    24    communicate that to his officers in training?

    25        A.  Well, there's so many -- there's just so many

1  underlying factors in your hypothetical that I believe

2  to be inaccurate and to belie the facts that I'm just

3  not prepared to answer that hypothetical, and I'm not

4  going to do so.

5    Q.  So you don't believe that the Charlotte Police

6  Department indicated that one of the causes of

7  Darryl Turner's death was ECD usage?

8    A.  Again, I don't -- I don't know that to be the

9  case, that that statement's ever been made.

10    Q.  Have you read -- you mentioned that you read a

11  case study from Dr. Zipes; is that correct?

12    A.  That is correct.  It's actually not -- case

13  series is the term I use.  You used the term "case

14  study."  I never acknowledged that term.

15    Q.  Okay.  Do you know if the case series was

16  entitled "Sudden Cardiac Arrest and Death Associated

17  With Application of Shocks From a Taser Electronic

18  Control Device"?

19    A.  That seems generally familiar as the title.

20    Q.  Okay.  And was it -- do you recall who it was

21  published in circulation, which is the Journal of -- for

22  the American Heart Association?

23    A.  I know that at least one or perhaps two of the

24  corrections and responses were published there.  I think

25  that the original case series may have been published

1   there or not, but I -- that's not where I saw it.

2      Q.  Are you familiar with the wrongful death verdict

3   by the failure of Darryl Turner against Taser

4   International?

5      A.  I am not.

6      Q.  If the Police Department had information that a

7   death can be caused by the use of a Taser, would that

8   change or alter your opinion as to how the officers are

9   checked or trained?

10     A.  If a Police Department had reliable scientific

11   evidence that had been peer reviewed that had been

12   subjected to the rigors of what most scientists accept

13   as a study and had been then juried by competent peers

14   and the information was that it was a situation capable

15   and likely to be repeated, I think that's certainly

16   something that should be discussed for inclusional

17   training.  Absent those factors, then that's a whole

18   other hypothetical.

19     Q.  So if a jury made a determination that a Taser

20   usage caused the death of Darryl Turner, would that

21   information cause you to change your opinion as to how

22   the Charlotte -- the City of Charlotte trains its

23   officers on the use of Tasers?

24     A.  I'd certainly want to take a look at what type of

25   jury it was, whether it was a civil jury, a coroner's

jury, what type of proceeding it was, what information

was presented, and just a whole host of factors to

determine whether, as you represent, a jury's finding

was appropriate for inclusion in training to police

officers.  So, based on what you've given me, I can't

answer beyond that.

Q.  And you weren't provided any documentation

related to the case of Fontenot versus Taser

International which is the family of Darryl Turner?

MS. KEETON:  Objection.  Asked and answered

repeatedly.

THE WITNESS:  I'm not quite sure how to

explain that to you, sir.  I'll do it one more time as

best as I can, and help me understand why I'm not

communicating to you.  I don't believe I ever discussed

it with defense counsel.  Defense counsel hasn't

provided me videos, documents.

I've never -- the name Fontenot is not

something that I've heard from defense counsel.  That's

something you've introduced here.  I -- I've tried to be

clear on that.  The answer is no.

BY MR. EVERAGE:

Q.  On page 12, the first sentence, Section B-6 of

your report you said or you wrote (as read):

"La-Reko Williams had marks, abrasions that may have

1  resulted from his fall incident to the first Taser

2  energy cycle."

3       What part of your -- of La-Reko Williams' body

4  are you referencing?  Do you recall?

5    A.  I don't recall, sir.  I did see photographs, but

6  I don't recall, as I sit here today, where the marks and

7  abrasions were.

8    Q.  Officer Forbes on page 13, section -- the first

9  sentence of Section B-8, you state or you wrote

10 (as read):  "Officer Forbes was required to make a

11 split-second judgment about how best to detain and

12 control Williams."

13      Do you know how long the confrontation between

14 Officer Forbes and Officer Greene -- excuse me,

15 Officer Forbes and Mr. Williams was?

16   A.  I don't recall and I don't have -- I don't have

17 the documents here before me to answer that for you.

18   Q.  Were you aware of the fact that a witness

19 testified that he observed a laser dot on La-Reko's

20 chest for several seconds up to a half a minute -- a

21 half a minute before Mr. Williams fell?

22   A.  I don't recall that testimony.

23   Q.  And you've never reviewed the testimony -- if

24 that testimony was given in a deposition of

25 Omari Greene, you haven't reviewed it?

1     A.  I have not seen Mr. Greene's deposition.

2     Q.  And as to the evidence in this case as to -- let

3  me rephrase that.  Is the evidence -- the evidence and

4  testimony that you reviewed indicate that Mr. Williams

5  was standing still and was not in motion when the

6  initial Taser shot was given?

7     A.  I don't recall from my review of the documents

8  whether there was testimony that he was motionless or

9  not, sir.

10    Q.  There's no testimony or statements given by

11 Officer Forbes or any of the witnesses that Mr. Williams

12 reached for or tried to obtain Officer Forbes's weapon;

13 is that correct?

14    A.  I believe that's correct.

15    Q.  I'll now read a couple of sentences from pages 14

16 and 15 that state (as read):  "Any reasonable officer

17 would have recognized Williams presented a threat of

18 grabbing for Officer Forbes' weapon, almost certain

19 result would have been one or more shooting deaths."

20       What did you mean by "almost certain"?

21    A.  When two people fight over a gun, particularly

22 when a suspect and an officer fight over a gun, it

23 becomes very frequently a fight to the death.  In fact,

24 just happened this past week, an officer grappled with

25 someone for his weapon, and the man was able to secure

        the officer's weapon and then shoot and kill the police
        officer.  That's the common result.

        Q.  Had there been some hand contact between
        Officer Forbes and La-Reko Williams previously, correct?

        A.  I'm not -- I'm not sure I understand your
        question, sir.

        Q.  Okay.  Did Officer Forbes attempt to detain
        La-Reko Williams using his hands at any point during
        their encounter?

        A.  Yes.  I'm sorry.  I thought perhaps you were
        referring to a prior time, a separate time.  Yes, you're
        correct.

        Q.  And during that event in which -- during that
        event that La-Reko Williams tried to obtain
        Officer Forbes's weapon?

        A.  There's no evidence of that.

        Q.  In paragraph B-10 you state (as read):  "Williams
        continued to pose a threat to Officer Forbes and
        Franklin as long as he refused to comply with orders to
        assume a position to facilitate handcuffing as long as
        he tried to stand up."

                Now, there -- in that sentence there, there's --
        there are two actions that you refer to, refusing to
        comply to assume a position to facilitate handcuffing,
        and the second thing that you refer to is trying to

1   stand up.

2      Is it your opinion that he was a threat if he was

3   trying to do both of these things, or is it your opinion

4   that he was a threat if he did just one of those

5   actions?

6    A.  In the disjunctive, either one.

7    Q.  So, if he was laying on the ground, he would

8   still pose a threat to injure someone or assault

9   someone?

10    A.  He could be.

11    Q.  Do you have any reference as to how far away

12   La-Reko Williams was from Officer Forbes when you made

13   that conclusion that he was a threat while on the

14   ground?

15    A.  I don't recall.

16    Q.  Do you have any reference point in making that

17   conclusion as far as how far La-Reko Williams was from

18   Destiny Franklin while he was on the ground?

19    A.  No.  I don't recall.

20    Q.  Would you agree that while La-Reko Williams was

21   on the ground before he could be a threat to

22   Officer Forbes he would either have to move towards

23   Officer Forbes, stand up in some manner, or

24   Officer Forbes move towards him?

25    A.  Absolutely not.

 1    Q.   Okay.  Well, can you explain why he would

 2   continue to pose a threat if he wasn't moving towards

 3   the officer, the officer wasn't moving towards him, or

 4   he wasn't standing?

 5    A.   Sure.  You -- and understanding that what you're

 6   asking here is -- is for me to give you an entire range

 7   of behaviors.  What comes to mind most is a very

 8   shocking video that I watched on a news report just last

 9   night where a man who was seated, appeared to be seated

10   calmly, excuse me, with his hands not immediately

11   appearing to be in any threatening position, he'd

12   actually been arrested and he very suddenly somehow,

13   despite being in handcuffs, took a handgun out, shot out

14   a window of a police car, shot an officer, and the

15   officers returned fire and killed the man.

16         Prior -- and as you watch the video, immediately

17   prior to the man drawing and firing the gun, there was

18   no indication whatsoever that the man had had a gun and,

19   in fact, one -- I don't know, but one could assume that

20   he'd been searched.  In this case, Williams had not been

21   handcuffed.  He had not been searched.  So there's just

22   one example, and there are certainly others.

23    Q.   Okay.  And there was no evidence that Williams

24   ever had a weapon.  Do you agree with that?

25    A.   I certainly agree that the hindsight that we now

1   have in 20/20 vision shows that there was not a weapon.

2   That certainly was not known to Officer Forbes or

3   Officer Franklin.

4       Q.  Okay.  Did Officer Forbes ever report that he saw

5   a weapon?

6       A.  Officer Forbes never reported after the fact that

7   he saw a weapon.

8       Q.  Okay.  Did Officer Forbes ever report that he

9   thought that he saw something that looked like a weapon?

10      A.  Again, in Officer Forbes' ability to report the

11  circumstances after they unfolded and after they

12  concluded, he did not report that.

13      Q.  Do you know if -- if Officer Forbes testified

14  that immediately before implementing the second Taser

15  strike he saw that La-Reko Williams's hands were on the

16  ground, would that -- would that observation be in any

17  way -- constitute a threat to the officer?

18      A.  Assuming that his hands were motionless, and he

19  was compliant, and his hands were on the ground in full

20  view, the answer would be no.

21      Q.  But even in that example that you gave where the

22  person was in a seated position and then stood up or

23  shot someone, there would have to be some motion, that

24  being said, to present a threat, correct?

25      A.  Well, one would assume so.  That was one of the

shocking things about the video.  It really is quite an

amazing thing because you don't see the gun.  You

actually don't see the gun, and you don't even realize

there has been a gun until you see that the window has

been blown out because he's able to fire the gun right

from -- right from the waist, and it's just not real

evident.

So, yeah, there would have to be some motion,

whether it would be a perceptible motion and one that's

within the field of vision or not, I don't know.

Q.  Are you familiar with Charlotte-Mecklenburg's

Police Department policy and definition of the defensive

resistance?

A.  I believe that I've seen that term in their

policies before.  I don't have their policies here

before me.

Q.  Okay.  I'll read it to you.  It's from policy

600-20.  It says (as read):  "Defensive resistance is

subjects engaging in the defensive resistance take

action to prevent being taken into custody, the goal of

this action is to escape and not to injure the officer.

This action may include twisting, pulling, holding on

affixed objects, or running away."

Do you agree that that is consistent with other

law enforcement policies or definitions that you're

1   familiar with in your training?

2       A.   That's -- that's consistent with other

3   definitions that I've seen, yes.

4       Q.   Do you know whether law enforcement policies

5   generally prohibit or allow an officer to deploy the use

6   of a Taser against an individual that is only engaging

7   in defensive resistance?

8       A.   Generally, a Taser would not be indicated for a

9   person engaging only in defensive resistance and nothing

10  more where there is some other means of bringing the

11  person into compliance, but I'm aware of policies that

12  certainly would allow for deployment of an Electronic

13  Control Device in circumstances that fit the definition

14  that you have just read to me or substantially similar

15  definitions.

16      Q.   Do you know whether the Charlotte-Mecklenburg

17  Police Department's policies and procedures allow for

18  the use of a Taser to get at someone that's only

19  displaying defensive resistance?

20      A.   Well, I'd be happy to look at the policy if

21  you've got it here that I can look at, sir, but I don't

22  have a clear recollection of the policy that I reviewed

23  sometime ago.

24      Q.   Would you agree that most policies in law

25  enforcement agencies would not allow for the usage of a

1  Taser in instances where only defensive resistance is

2  being offered?

3      A.  I would agree that most policies that discuss the

4  issue would contraindicate the use of an Electronic

5  Control Device if there is merely resistance that's not

6  assaultive, not threatening, and there is some

7  alternative means of controlling or taking the person

8  into custody.

9      Q.  You discussed in Section C of your report that

10  Officer Forbes is trained in de-escalation techniques.

11  Can you explain what de-escalation techniques are?

12      A.  Well, generally, de-escalation techniques are

13  communication techniques.  They are interpersonal

14  communications skills that are taught to help persons

15  understand how to reduce the tension, reduce the

16  aggression, perhaps even reduce the verbal resistance

17  offered by combatants or assaultive persons or persons

18  who were involved in some kind of a confrontation,

19  altercation dispute, and so forth.

20      Q.  Is a technique of de-escalation, would one of the

21  techniques be explaining or trying to answer questions

22  if a suspect is asking questions?

23      A.  Well, broadly speaking, that certainly would be

24  within the scope of what could be possible, assuming the

25  circumstance was appropriate for answering questions and

1  engaging in a dialogue.

2      Q.  Would another technique of de-escalation involve

3  allowing a suspect additional time for additional or

4  subsequent forces used?

5      A.  It could be.

6      Q.  Would another technique of de-escalation involve

7  allowing more time for additional forces used to allow

8  adequate backup or additional officers to arrive?

9      A.  In certain circumstances that could be within the

10  realm of possibility, as well.

11      Q.  Now, I've looked at some of your qualifications,

12  and I just want to ask you a few brief questions.  I

13  want to start with your employment.  Where are you

14  employed, Mr. Wall- -- am I saying your name correctly?

15  Wal-EN-tine?

16      A.  That's close enough, Wallentine, yes.  Until

17  yesterday I was employed at the office of the Utah

18  Attorney General.

19      Q.  Okay.  So you're no longer employed there?

20      A.  I am not.

21      Q.  Okay.  Was the separation voluntary or

22  involuntary?

23      A.  It was voluntary.  I retired after 32 years of

24  service, which was 12 years longer than I was required

25  to, to obtain a pension.

```
 1       Q.  Well, congratulations.
 2       A.  I've got to tell you this morning I feel like a
 3   retired guy so thank you.
 4       Q.  Um, you mentioned that you are a consultant for
 5   Utah Risk Management Mutual Associates; is that correct?
 6       A.  It's Utah Risk Management Mutual Association,
 7   yes, sir.
 8       Q.  Association.  And is that an insurance company --
 9       A.  It's --
10       Q.  -- or association?
11       A.  It's a risk management pool and so it's a group
12   of public entities that come together to secure
13   insurance coverage at -- you know, obviously, try and
14   get together so they can get a reduced rate or share
15   costs and risk.
16       Q.  And they insure municipalities and law
17   enforcement officers?
18       A.  They insure municipalities.  They may have some
19   other government entities besides municipalities, but
20   they primarily insure municipalities.
21       Q.  And as a consultant --
22               THE REPORTER:  Mr. Everage?
23               MR. EVERAGE:  Yes.
24               THE REPORTER:  The videotape is almost out.
25   We might need to take a break.
```

          MR. EVERAGE:  Okay.  We'll come back at 2:20

and 12:20.

          THE WITNESS:  Who uses tape anymore?

          THE VIDEOGRAPHER:  Okay.  Going off the

record.  This is the end of tape number one.  The time

is 12:16.

          (Whereupon a recess was taken.)

          THE VIDEOGRAPHER:  Okay.  We're back on

record.  This is the beginning of tape number two.  The

time is 12:31.

BY MR. EVERAGE:

     Q.  We were discussing your employment by Utah Risk

Management Mutual Association.  Are you paid a salary,

or are you paid by the compensation arrangement?

     A.  Actually, sir, I'm not employed, just a

consultant, so I'm paid on an hourly basis for my work

for them.

     Q.  Okay.  And are you hired for specific cases or

assignment, or do you have an ongoing retainer or hourly

arrangement with them?

     A.  No.  I don't have an ongoing retainer for now.

Right now, for example, I'm working for them putting

together some material for a risk management training

conference for city attorneys and police chiefs so it

just depends.  I might go months and months and not do

 1    any work for them at all.

 2       Q.   Okay.  Would it present a conflict of interest

 3    for you to provide more services to a person or a family

 4    of a deceased that had a potential claim against a law

 5    enforcement officer for or some other municipality in

 6    Utah?

 7       A.   I've done that in other states, but I would not

 8    do that in Utah.

 9       Q.   In your listing of cases in which you provided

10    expert testimony, I just want to confirm something.  Is

11    it accurate that you have always testified on behalf of

12    defendants with the only exception being that you've

13    testified on behalf of the United States as a plaintiff

14    on a couple of occasions?

15       A.   That's not accurate.

16       Q.   Okay.  Have you ever -- in your listing have you

17    ever provided testimony on behalf of plaintiffs that

18    have been injured by police officers or subjected to

19    some type of excessive force of constitutional

20    violation?

21       A.   Yes.

22       Q.   Okay.  Are any of those cases listed in your

23    report?

24       A.   Yes.

25       Q.   Can you help point those out for me?

 1    A.  Yes.  The -- only one of those cases is listed in
 2  my report, and it wouldn't -- I can see why you would
 3  ask me that because it wouldn't be readily apparent to
 4  you, but in the case of Ibarra versus City of
 5  Watsonville, I testified that Officer Ibarra in that
 6  case used excessive force, unconstitutional excessive
 7  force, against a young man in the course of arresting
 8  that young man.
 9    Q.  Okay.  And what page is that listed on?
10    A.  It's on page 26 just about a third of the way
11  down.  It's Ibarra with an "I", I-b-a-r-r-a, versus City
12  of Watsonville.
13    Q.  Okay.  And you would have provided testimony on
14  behalf of the city in that case?
15    A.  I don't -- I don't recall whether it was the city
16  or -- it was some government entity that hired me to
17  testify contrary to the interest of the police officer.
18    Q.  Okay.  Was Ibarra the police officer in the
19  controversy?
20    A.  He was.
21    Q.  And that wasn't an action for a violation of
22  civil rights or excessive force on him, was it?
23    A.  I believe there was one, but I didn't get to the
24  point that I testified in that.  I testified before the
25  civil service hearing panel when he was contesting his

termination that was based, in part, on a finding that

he had exercised unconstitutionally excessive force

against an individual arrested by him.

    Q.  And any personal injury action or 1983 claim or

action for excessive force, have you ever testified in

support of a plaintiff or person that alleged that they

were injured or violated by a police action?

    A.  Yes, I have.

    Q.  Are any of those cases listed on your report?

    A.  No.

    Q.  The list on your report seems comprehensive that

is, just by my estimation, a page and a half

approximately, and that includes cases within the last

four years, correct?

    A.  It included cases within the four years prior to

December of 2013 when I provided this report.

    Q.  And currently are you representing any

individuals or families of individuals that have been

injured or had their lives violated by police officers

in any litigation?

    A.  No.  No, I am not.

    Q.  And did you -- were you the author of an article

regarding Taser "A" points and directives given by Taser

regarding rear aim?

    A.  Yes.

1          MR. EVERAGE:  I don't have any further

2   questions at this time.

3          MS. KEETON:  We're going to have some

4   questions here.  Can you all hear us okay?

5          THE WITNESS:  I can hear you, yes.

6                    EXAMINATION

7   BY MS. KEETON:

8     Q.  Okay.  Mr. Wallentine, I'm Lori Keeton.  We've

9   met before, and I represent Officer Forbes.  I just have

10  some follow-up questions for you.

11         First of all, I know we discussed your background

12  briefly.  I wanted to ask you if you could, please,

13  explain your background as far as it relates to ECD.

14    A.  Well, I have been a police officer since -- well,

15  a police officer since 1982.  I worked in corrections

16  for a brief period of time before that and have been

17  generally familiar with Electronic Control Devices since

18  they first started to gain some acceptance.

19         I was exposed to a device called the Air Taser

20  which was one of the early standoff Electronic Control

21  Devices.  So, in terms of history, I've -- I guess it

22  would be fair to say that I've grown up in law

23  enforcement being familiar with Electronic Control

24  Devices.

25         I am an instructor, certified instructor, for

using and teaching others how to use Electronic Control

Devices.  I'm trying to remember when, and I don't know

if I referenced that in my report, but I've been an

instructor for several years in the use of Electronic

Control Devices, and I've taught user classes and taught

in instructor courses and lectured on the use of

Electronic Control Devices in a number of circumstances,

and then I think you're both aware I've testified in

other cases that have involved, um, Electronic Control

Devices.

Q.  What's required to be certified as an ECD

instructor?

A.  Well, the first step is one must be a certified

Electronic Control Device user and then go to a training

program.  It's a Train-the-Trainer program that consists

of pre-study, one receives some homework assignments.

There's -- there are reading materials to study and then

a test.  I don't -- I don't recall the name of the

educational institution.

It's a college that has -- that offers the

course, and then you take a test through the college's

testing center.  If you pass that pre-education

requirement, then you're allowed into a two day

Train-the-Trainer course where you learn about the

device, how the device operates, the various types of

1  Electronic Control Devices, talk about some of the

2  medical considerations and what happens when the device

3  may fail, and you learn techniques for teaching other

4  students.  That certification is valid for I believe

5  it's two years and then at the end of the two years you

6  are required to repeat your training and become

7  recertified.

8      Q.  Would it be fair to say that you have taught

9  officers, such as Officer Forbes, how to use the ECD and

10  given them their training?

11     A.  Yes.  I did not teach Officer Forbes

12  specifically, but the type of class that he sat through

13  on a couple of different occasions and the type of

14  scenarios that he engaged in in his training on a couple

15  of different occasions is similar to training that I had

16  presented to other law enforcement officers, deputy

17  sheriffs, Highway Patrol troopers, municipal police

18  officers on a number of occasions.

19     Q.  And now, if you don't mind, can you tell me --

20  there's still a lot of what you did and did not review

21  in this case.  Would you mind putting on the record what

22  you reviewed in forming your opinions in this case?

23     A.  Yes.  And I'm referring to pages one and two of

24  my report.  The first thing I looked at is typically my

25  practice is the plaintiffs' complaint and the answers,

 1   the responsive pleadings, and then the discovery, that
 2   is, interrogatories, responses to interrogatories,
 3   sometimes their initial disclosures.  I was provided in
 4   this case a number of police reports relating to the
 5   contact with La-Reko Williams.  I reviewed the training
 6   records for Officer Forbes, the dispatch records
 7   pertaining to this particular incident.  I was provided
 8   with policies of the Charlotte-Mecklenburg Police
 9   Department, not the entire policy manual.  I looked at
10   their policies relating to user force, their policies
11   relating to Electronic Control Device application.

12        In addition to the individual officer training
13   files, I also was given the opportunity and did examine
14   the -- the Police Department's training curriculum and
15   training documents for use of force and Electronic
16   Control Device, the Taser training modules that were
17   presented to Officer Forbes and his training and other
18   officers.

19        I looked at one deposition transcript in this
20   case that was prepared prior to my report.  That is the
21   deposition of Officer Michael Forbes.  Um, I also looked
22   at the interview transcript with Officer Forbes, the
23   transcript of a second interview with Officer Forbes
24   that was done by the Charlotte-Mecklenburg Internal
25   Affairs of -- I don't know if it's a bureau or division.

 1    Then I looked at transcripts that were provided to me

 2    for a number of persons, including Destiny Franklin, um,

 3    Omari Greene, Khalilah Brown, uh, Eddy Brown,

 4    Aaron Abbott.  I was -- I looked at the coroner's -- or

 5    I believe you call it Medical Examiner's Report in your

 6    state, the Medical Examiner's Report, the autopsy

 7    findings and autopsy photographs, other photographs

 8    related to the incident, video recording from the -- I

 9    believe it was a dash camera.  I looked at a Data

10    Download Report that was provided to me that allowed me

11    to review the activation history of a particular X26

12    device carried by Officer Forbes.  Um, I looked at a

13    report -- I'm sorry, I think there was one other thing.

14    I looked at a report submitted by Mr. David King, and I

15    -- I believe that that's -- I think I've caught it all.

16       Q.  And when was your report drafted, if you recall?

17    What is the date of your report?

18       A.  I recall when it was drafted.  I don't recall the

19    date.  I recall when it was drafted because I just got

20    back in the country from China so it was right at the --

21    it was at the first of -- right before Christmas, the

22    first of December, first couple of weeks, and I signed

23    it on December 13th of 2013.

24       Q.  Okay.  And so it's fair to say it's been a few

25    months since you drafted this report?

A.  It's been a few months since I drafted the report, and actually most of the documents that I've just listed for you were documents that I examined, and I don't recall the exact time frame, but they would have been before I spent a couple of weeks in China at the end of November, Thanksgiving, early part of December.

Q.  Is your report drafted based upon your review of the documents you have listed?

A.  Yes, it was.

Q.  And there's been talk about you not being given depositions to review.  Is it fair to say you were given interviews to review?

A.  Yes.  I was given interviews that were -- were taken much closer in time to the incident of July 20th, 2011.

Q.  And is it actually your preference to review interviews as opposed to depositions?

A.  Well, I don't think anybody in their right mind likes to read depositions, but I generally prefer to have interviews simply because almost always the interviews are performed when they're closer in time to the event about which the folks are discussing and so typically you get a better recollection.

They're typically conducted prior to meetings with attorneys or other discussions that may shape a

person's recitation of recall, so, yes, I do prefer,

when I can get the interviews and if the interviews are

of decent quality, I prefer to see the interviews.

Q.  Was there any information that you requested that

you needed to form your opinions and did not get it?

A.  No.  There was not.

Q.  And now I know this is pretty basic, but you

haven't been asked actually to do this.  Can you please

state the opinions you have in this case based on your

experience and would you give it to us?

A.  Well, yes.

Q.  The basis for each, if you can.

A.  Yes.  I can do that.  And probably the most

sensible thing for me is just to refer you to -- as

Mr. Everage pointed out, I did organize my opinions here

into some headings, and my first opinion in this case is

that when Officer Forbes gave commands to La-Reko Evans

-- excuse me, La-Reko Williams, and tried to effect the

detention of La-Reko Williams, that was consistent with

what a well-trained and a reasonable police officer

would do and was consistent with the generally accepted

police policies, practices, procedures and training.

The basis for that opinion is that this call

unfolded as a domestic violence call, and, you know,

sadly or it just is a fact of life that police officers,

deputy sheriffs are called often in the United States to
respond to domestic violence calls; in fact, officers
know that some of the most deadly circumstances in which
they can walk into are domestic violence situations.  In
this case, there were separate pieces of information
coming in of a domestic assault occurring at a train
station.  It's a -- and I'm sorry, I've forgotten the
name of your system there, but it's a Light Rail System
there in the Charlotte-Mecklenburg area.

        So the police received separate calls for help.
The calls were consistent in that there was a domestic
assault unfolding.  The calls were somewhat remarkable
in that off times calls like that are from either
anonymous calls or -- callers or from callers who will
call, dump a bunch of information and then hang up, and
sometimes you'll hear the term, well, I don't want to
get involved, leave me out of this.

        But, in this case, there was detailed information
and so as the first ground for my opinion here is that a
duty arose for Officer Forbes to respond to a situation
that he believed or should have believed a reasonable
officer would have believed was a domestic violence
situation, and then an officer would know that she or he
has a duty to intervene in the domestic violence
situation.

1      So the response was appropriate in

2 North Carolina, like many states, perhaps all states,

3 has a statutory obligation bestowed upon law enforcement

4 officers to respond to domestic violence.

5      All right. Another basis for that first primary

6 opinion is that as Officer Forbes arrives at the scene,

7 he's been given information; some of that information is

8 communicated to him as coming directly from the

9 complainant, from Ms. Franklin. He confirms that

10 information with his own observation; as he comes up,

11 what he sees is harmonious with what he'd been told by

12 the dispatcher, and so a reasonable, well-trained police

13 officer, and police practices dictate the first thing

14 you do, you don't have the luxury of time. You've got

15 to step in and separate the parties, prevent further

16 assault, stop the physical -- physicality, break people

17 apart, and then find out what happened.

18      This isn't a situation where you can say nothing

19 to see here, folks, move along. This is a situation

20 where a police officer has a duty to ascertain what has

21 happened, has an affirmative duty in some cases to make

22 an arrest, and has a duty to prepare -- to obtain enough

23 information and prepare a police report.

24      And so Officer Forbes breaks up the

25 confrontation, and he then recognized, as would a

reasonable and well-trained police officer, that he had

a duty to find out what happened to gather information,

and that means stopping, detaining La-Reko Williams as

he's wanting to leave the scene.  And so, based on that,

my opinion is that a reasonable officer would have

detained, uh, would have detained Mr. Williams and

potentially would even have arrested him for a domestic

violence assault.

So that's -- that's the first opinion that I've

rendered and the basis for that first opinion.

Q.  So it was reasonable for Officer Forbes to rely

upon the 911 calls?

A.  Well, yes.  Police officers don't have the gift

of looking down from the heavens above and knowing what

the facts are.  They've got to rely on information that

is relayed to them by the dispatcher, and, in this case,

the one thing that was remarkable that, in this case,

Officer Forbes -- and he may not have known this.  I

don't remember whether he did or not.  But he's getting

information supplied by separate callers.  It's not only

reasonable.  He has to rely on that information.  Police

officers go places every day of their lives and take

action based on third-party information.  That's how

they do -- that's how they do business.

Q.  And so the fact that when he arrived he saw them,

1   in his words, tussling, that was just one piece of the

2   puzzle for him; is that correct?

3       A.   Well, yes.   It's one piece of the puzzle, but

4   it's not only one piece of the puzzle; it's consistent

5   with the other pieces he's been provided by other people

6   relaying through dispatch.   So that -- I -- it would not

7   be fair for you to say that's just one piece.   It's one

8   piece that's consistent with the other pieces.

9       Q.   And you believe that Officer Forbes had the

10  reasonable suspicion to detain Mr. Williams at that

11  point in time?

12      A.   I do.   A reasonable officer who had been trained

13  on what reasonable suspicion is would recognize that

14  there was reasonable suspicion and, I would even say,

15  probable cause to arrest to investigate the domestic

16  violence that had been reported, and he actually saw a

17  physical alteration -- altercation.

18      Q.   And then do you have any other opinions?

19      A.   I do.   Mr. Williams did not respond to verbal

20  commands and so Officer Forbes then, after attempting

21  verbal commands, used a measure of force to accomplish

22  the detention of Williams, and that that force was

23  consistent with the actions of a reasonable and

24  well-trained police officer.   It was consistent with

25  generally accepted police practices, policies and

training, and that includes the decision by
Officer Forbes to use an Electronic Control Device, the
particular device in this case is the Taser X26 device,
to accomplish the detention of La-Reko Williams.

Q.  And you were asked -- and would you have
described Mr. Williams' behavior in this case as being
passive resistance or defensive resistance?

A.  Well, now I was asked -- Mr. Everage asked me,
and he quoted from a policy, and I'll just note that
there's some gradients and disparities across the
country, of course, in policies as to what passive
resistance is or defensive resistance.

But this situation here, the facts here that
presented to Officer Forbes were more, amounted to more
than just as defined earlier as defensive resistance.
There's actually an active confrontation.  Williams
disobeys commands that are lawful to submit to detention
so that Officer Forbes can undertake those
responsibilities, as I've just described.

He -- he -- and you use the word "tussles."  It
would be fair to say that he tussles with -- Williams
tussles with Officer Forbes.  He didn't just try and
walk away and not talk.  He actually tries to engage in
force with Officer Williams -- and, again, I emphasize
officer -- or, excuse me, Officer Forbes.

Officer Forbes had a duty here, a reasonable officer would have recognized he had a duty to undertake certain actions because of the domestic violence that had been reported. And you -- it would not be fair for me to evaluate the physical interaction between Mr. Williams and Officer Forbes and not understand that there had just been a physical confrontation between Ms. Franklin and Mr. Williams. You've got to -- in fairness, a police officer's going to take all of that into account.

Q. So that all plays into the equation of whether or not the force was reasonable?

A. Well, it does. I mean, there's kind of an intermediary step there that officer -- not only does Officer Forbes give some verbal commands, you know, some really, really when we talked about de-escalation techniques earlier, he gave some -- you know, some pretty flat, benign, non-confrontational, non-accusatory commands.

When Mr. Williams made the choice, when Mr. Williams opted not to comply and not to cooperate, Officer Forbes then tries to use a -- what we call in law enforcement a soft, Empty-Hands techniques, basically just going hands-on to stop Williams.

Mr. Williams doesn't -- doesn't just kind of pull away. He actually pushes back against the officer

 1    twice.  He gets aggressive with Officer Forbes, and

 2    that's when Officer Forbes is now at the point of where

 3    a reasonable and well-trained officer would consider

 4    some other force options, and, of course, that's what

 5    Officer Forbes did.  He considered other force options.

 6        Q.  Now, can you talk a little bit about the use of

 7    force, and specifically the second deployment, and what

 8    factors you consider to show what is reasonable?

 9        A.  Well, in the second -- the second deployment

10    comes when, again, Mr. Williams is not being compliant.

11    He doesn't -- Officer Forbes doesn't have the ability

12    yet to have someone help take him into custody.  I think

13    he had made a -- he'd recognized that there was -- he'd

14    recognized that there was a need for his backup officer

15    to hurry.  I think that the term used was, uh, step it

16    up.

17            And once -- once Mr. Williams starts to make any

18    move to get back up and to move away, there are a couple

19    of things that are -- that need to be taken into

20    consideration by Officer Forbes.  One is that while the

21    energy cycle is not activated, Mr. Williams had the

22    capacity to break the effectiveness of the Taser X26

23    device.

24            He could pull out the probes.  He could -- those

25    wires are thin.  They are actually -- and I don't think

you can see this on camera, but the wires from the X26
are actually thinner than some of the hairs in my
mustache.  I mean, I've looked at them both under a
microscope, and they actually are very thin.  They're
very easily broken.  But a reasonable officer would
recognize that until Williams can be controlled, until
he can be handcuffed, until he can be searched, let's
not gloss over that.  That's a very important fact.
Mr. Williams has not been searched yet.

      Officer Forbes has got an obligation to keep him
under control, and the best way for him to keep Williams
under control when Williams starts to get up again is to
give additional verbal commands and to apply a second
energy cycle of the Taser device, and that's what he
did.

Q.  Should he have attempted to cuff under power
between the first and second deployments?

A.  Well, he wouldn't -- he should not have attempted
to cuff between the first and second deployments.  When
we talk about this term "cuff under power," we're really
talking about the officers touching, laying hands on the
subject while the subject is receiving energy delivered
by the Taser device, and the point of teaching officers
to cuff under power, and I've done this in class, and we
teach officers that someone who's receiving an energy

cycle, if you run up and touch them you won't be a
subject to the energy cycle. In other words, you're not
going to be shocked by the Taser. That's what we mean
when we talk about cuffing under power.

Cuffing under power is something that typically
is done with two or more officers. At the point that
the second cycle has begun, there aren't two officers at
the scene, and so, no, it would not be the best course
of action for Officer Forbes to attempt to handcuff
under power. The best thing for him to do, one very
reasonable option is the option that he chose, that's to
maintain standoff distance, to apply a second energy
cycle.

Officer Franklin was there very shortly and then
they're able to use the ability of marginal superiority
of numbers to obtain control and get Mr. Williams into
handcuffs.

Q. And do you have any other opinions?

A. Well, I also looked at the training. I looked at
the training that was done by the Charlotte-Mecklenburg
Police Department. It was -- I did ask for it, and it
was provided the full -- what I believe to be -- was
represented to me to be the full training curriculum for
the Taser X26 device.

I also looked at Officer Forbes' training to make

sure -- and I actually did. I looked at his tests to
make sure that he passed his initial testing in, uh, I
think it was 2008. He then did recertification testing
in 2009. He passed that test, as well, and then passed
-- passed testing in, uh, 2010, and then I think just
before this incident in 2011. I reviewed the training
curriculum, found the training curriculum to be
consistent with the training that is generally used by
public safety agencies, law enforcement agencies
throughout the United States, found they included
scenario based training, found very significantly that
it included testing, that officers required to take a
test and pass the test, that there was decision making
component and found that the Charlotte-Mecklenburg
training program was at least as good as, and I actually
think it was better than, training that's offered in
other police agencies. It really meets best practices
for Electronic Control Device training.

And I'd have to go back and look at my report,
but one thing that was notable was that Officer Forbes
had recertified and retrained on the use of this
particular Taser device on a number of occasions.

Q.  And do you have any other opinions that you plan
to offer in this case?

A.  Well, I did.  I don't recall whether I was

specifically asked to or not, but I did also look at the
policies governing the Electronic Control Device and use
of force promulgated by the Charlotte-Mecklenburg Police
Department. One of the things that is a little bit
unique -- it's not a little bit. It's actually quite
unique to the Charlotte-Mecklenburg Police Department is
that it had undergone a peer review by a well-respected
organization, the Police Executive Research Forum, of
its Electronic Control Device policies.

I've done similar reviews for other agencies and
so I'm generally familiar with how that's done, and I
found that in my review of the Charlotte-Mecklenburg
Police Department policies governing use of force and
governing use specifically of the Electronic Control
Device, that their policies reflected best practices,
that notably their policies had been reviewed on an
irregular cycle, that, as I mentioned, somewhat uniquely
they had been reviewed by an outside peer reviewed
research body, and that the Charlotte-Mecklenburg Police
Department had a process in place and a process that
happened in this case to have their policies reviewed on
a regular basis by legal staff, and I guess to use the
vernacular of law enforcement, I would just say that I
found that they had very dialed in, very up-to-date
policies in these areas.

1    Q.  Have you covered all of your opinions?

2    A.  That's the extent of what I've been asked to look

3    at thus far.  You know, certainly I might have other

4    opinions if I'm asked to look at other issues or

5    presented with other documents or evidence in the case.

6    Q.  I just had a few other questions just based upon

7    what you were asked on direct, and these I'm going to

8    jump around a little bit.  A lot was asked about the

9    potential for the Drive-Stun marks upon Mr. Williams's

10   body.

11       Let's just assume hypothetically they were

12   Drive-Stun marks.  If another officer, other than

13   Officer Forbes, did that to Mr. Williams, would that

14   have any relevance to Officer Forbes use of force?  In

15   other words, does it enter into the analysis of whether

16   Officer Forbes acted reasonably in this instance?

17   A.  No.

18   Q.  Did you seek any evidence to support the idea

19   that Officer Forbes intentionally cut his mike pack off?

20   A.  I did not.  Those -- those devices, they're as

21   robust as they can be, but they malfunction.  I'm very

22   familiar with them, used them in my own career.

23       I have two children that are law enforcement

24   officers, one of them wears one all the time, and we've

25   had discussions about it seems that they encounter

static or cut off at the most inopportune time, and they

then pick up recording other times when one wishes they

did not.  I remembered to take my mike off here before I

went to the restroom.  Cops don't always do that.

Q.  Now, on the preferred target then, which you all

discussed, I just want to be clear, is it prohibited to

shoot the ECD in the chest area, as Officer Forbes did

in this case?

A.  No.  It's not.  I -- Mr. Everage provided an

exhibit here today, Exhibit 2 dated May 31, 2011, but

this is just -- this exhibit is just the eight page

warnings that were in effect on May 31, 2011.

What this exhibit doesn't include is something

that really should be read with it.  I don't have that

here today, but Taser also issued a question and answer

memorandum to help people understand what this means.

And Taser makes it very plain that based on their

research, based on experience, based on science, and

based on the law, no, it's absolutely not prohibited for

targeting that occurs other than the optimal -- optimal

target zones, and that happens.

Q.  And you've been asked a lot of questions about

the Darryl Turner case and your knowledge of the

Darryl Turner case.  If I were to tell you that in that

case evidence was that the officer held the ECD device

1   down for approximately 36 seconds, would that case be

2   distinguishable from this case, in your opinion?

3       A.   Oh, absolutely.  That's -- to quote Cole Porter,

4   that's night and day.  36 seconds versus a five second

5   deployment separated by a break in energization and

6   another five second deployment, that's worlds apart from

7   one continuous 36 second energy cycle, worlds apart.

8       Q.   Okay.  Okay.  And that's all the questions that

9   we have, but I know you had something you wanted to put

10  on the record, Mr. Wallentine, you mentioned about the

11  payments from us?

12      A.   I did.  Mr. Everage, under the federal rules it

13  typically, and I realize you scheduled this at the last

14  minute, but, you know, clearly under the rules I'm not

15  obligated to be here this morning without payment in

16  advance.

17          I certainly showed up, but just would like to get

18  on the record that I did that.  And I'll send you an

19  invoice and then would just appreciate your

20  acknowledgment on the record of that and commitment then

21  to pay that invoice in an expeditious fashion, sir.

22              MR. EVERAGE:  We do acknowledge.

23              MS. KEETON:  And that's it for us.

24              THE WITNESS:  Thank you.

25              MR. EVERAGE:  I just have a few follow-up

```
 1   questions.
 2                  THE WITNESS:  Yes, sir.
 3                      FURTHER EXAMINATION
 4   BY MR. EVERAGE:
 5       Q.  Can you identify any cases in which you provided
 6   consultation, testimony, consultation or testimony that
 7   involved the use of ECD devices?
 8       A.  Yes.  Let me --
 9       Q.  What are those cases?
10       A.  Let me turn to my report.  The first one would be
11   Chief versus West Valley City Police Department.
12       Q.  From what page are you referencing?
13       A.  Page 25, sir, about halfway down the page.
14       Q.  You said Chief versus West Valley?
15       A.  West --
16       Q.  Okay.  Any other cases?
17       A.  Uh, yes.  The third line up from the bottom of
18   page 25, Alusa versus Salt Lake County Sheriff.
19       Q.  Okay.
20       A.  Page 26, four lines down -- no, excuse me, six
21   lines down, Cavanaugh versus Woods Cross City.  And
22   about halfway down, Cardall versus Thompson.  About
23   two-thirds of the way down, Mitchell versus Dow.  And
24   that's all from that list.
25       Q.  Do any of these cases that you've identified
```

1  involve the death of anyone?

2     A.  Yeah.

3     Q.  Can you identify the ones that involve deaths?

4     A.  Cardall versus Thompson.

5     Q.  Is that the only one?

6     A.  Yes.  It's the only one that involves a death

7  from a Taser.

8     Q.  And --

9     A.  Excuse me.  The only one --

10    Q.  Was that --

11    A.  It's the only one that involves a death where a

12 Taser was deployed in the course of other force being

13 used.  I think I said death of a --

14    Q.  Was there a --

15    A.  I'm sorry.  Go ahead.

16    Q.  Cardell versus Thompson, did that case go to

17 trial?

18    A.  It -- is it Thompson?  It did not.  Oh, it is

19 Thompson.

20    Q.  Do you know if it was dismissed or if a

21 settlement was reached?

22    A.  I believe that the matter was dismissed, but I

23 believe it was dismissed pursuant to a settlement.

24    Q.  And you gave some testimony regarding the use of

25 mike packs.  Have you provided any expert opinion as the

1   user of the mike packs or the use of mike packs or how

2   they work or of their reliability, are you?

3       A.   Not in this case.

4       Q.   Are you aware if the peer review process that you

5   mentioned occurred before or after the death of

6   La-Reko Williams?

7       A.   I am not.

8       Q.   Are you aware of what information was provided to

9   the police organization that performed the peer review

10  for the City of Charlotte?

11      A.   I -- I am not.  Off the top of my head, I read

12  the report of the Police Executive Research Foundation,

13  and I believe that there was either an appendix or in

14  the introduction.  There was a discussion of the

15  material that had been provided, but I don't recall,

16  Mr. Everage.

17      Q.   And you were asked whether evidence that the

18  third application of a Taser in Drive-Stun Mode

19  contributed to your opinion as to whether or not

20  Officer Forbes acted correctly on that day, correct?

21      A.   There was a --

22      Q.   Is that the question?

23      A.   There was a question that generally discussed

24  something like that, yes.

25      Q.   Uh, do you agree that the City of Charlotte still

has a responsibility to investigate and ensure that all

of its officers are using Electronic Control Devices in

lawful and appropriate manners?

A.   And by "all," I'm assuming that you mean all

officers that the city has authorized to use those

devices and has provided the devices, yes.

Q.   And you stated that you reviewed some data

dumped, downloaded information from Officer Forbes's

Taser; is that correct?

A.   Yes.

Q.   Were you provided with any similar data from any

other police officers that were on the scene that had

Tasers?

A.   No.

Q.   In your experience as -- in your experience as a

law enforcement officer, do you conduct the use -- have

you ever conducted use of force investigations or

inquiries?

A.   Yes.

Q.   All right.  In conducting would you agree that

the City of Charlotte's policies on the use of force, of

investigating uses of force were appropriate?

A.   Yes.

Q.   Would it be consistent with law enforcement best

practices if there was competent evidence from a Medical

1    Examiner of a Drive-Stun use of force by a -- on a

2    deceased subject that the Police Department would

3    investigate that?

4        A.   Well, if there was -- if there was competent

5    evidence that there was actually a touch mode

6    application of a Taser, um, that would be some but a

7    question to be asked.

8        Q.   I don't quite understand what you said, a

9    question to be asked.  Let me just be a little bit more

10   specific.  If the Medical Examiner's Office provides

11   information to the Police Department and to Internal

12   Affairs saying that there's a Drive-Stun Taser injury on

13   a deceased subject, would it be appropriate for the

14   Police Department, which governs the use of force by its

15   officers, to fully investigate that determination made

16   by the Medical Examiner's 0ffice?

17       A.   Well, it certainly would be an issue to be

18   explored.  The challenge that I hear in your question is

19   that it's a pretty rare day that you would get a coroner

20   or a Medical Examiner or a pathologist concluding that

21   there were marks that resulted from a touch mode

22   application of an Electronic Control Device without kind

23   of the opposite happening of what you're talking about.

24            Typically, the question is raised to the Medical

25   Examiner, here's evidence that an Electronic Control

Device was applied, are these marks consistent with what we are telling you happened simply because the marks that may be left, and a touch mode application doesn't always leave marks, but the marks that may be left can vary so widely that they're not -- it's not a self-evident conclusive pattern injury, and there are many, many other vectors of injury that can present a similar injury to a touch mode application of an Electronic Control Device.

Q.  I don't think you answered my question.  I'm going to ask the court reporter to read my question back, please, if she's able to, or he.

(Whereupon the requested portion of the record was read.)

BY MR. FULTON:

Q.  The question is would it be appropriate for the Police Department to investigate that history?

A.  Again, assuming -- assuming the veracity of a pretty farfetched hypothetical that you've given me, yes, that's certainly something that a Police Department should investigate.

MR. EVERAGE:  I don't have any further questions.

MS. KEETON:  Nothing further here.

THE VIDEOGRAPHER:  Okay.

```
1                 MR. EVERAGE:  Will you pause for just a
2    second to allow me to review my notes --
3                 THE WITNESS:  Certainly.
4                 MR. EVERAGE:  -- please?
5                 THE VIDEOGRAPHER:  Going off record.  The
6    time is 1:27.
7                 (Discussion held off the record.)
8                 MR. EVERAGE:  We've concluded our
9    deposition.
10                THE WITNESS:  Well, I'd say it's a pleasure
11   to meet you, but, you know, Mr. Everage, anymore it's
12   interesting how we equate this, you know, video imaging
13   and texting.  Young people today, they have lots of
14   substitutes for sociality.  I don't find it so, but you
15   have a nice day there.  It's 80 degrees.  I can at least
16   see sunshine on the snowy trees out here.
17                MR. EVERAGE:  For the record, I wanted to go
18   to Utah, but I got outvoted by co-counsel.
19                THE REPORTER:  Mr. Everage, do you --
20                MR. EVERAGE:  I've never been.
21                THE REPORTER:  Mr. Everage, what kind of
22   copy do you need?
23                MR. EVERAGE:  Everyone have a nice day.
24                THE WITNESS:  Don't hang up.
25                THE REPORTER:  Mr. Everage?
```

1          MR. EVERAGE:  Yes.

2          THE REPORTER:  What kind of copy would you

3 like?

4          MR. EVERAGE:  Yes, ma'am.  We want the video

5 synchronized, video synchronized copy and an e-copy, the

6 disk, condensed copy, whatever.  We need the e-copy and

7 video synchronized on DVD.

8          MS. KEETON:  I would like an e-transcript

9 with a PDF.

10          THE VIDEOGRAPHER:  Okay.

11          THE REPORTER:  Okay.  Thank you.

12          THE WITNESS:  I want to read and sign.

13          (Whereupon the video conference deposition

14 was concluded at 1:30 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF UTAH          )
                            ) ss.
 2   COUNTY OF SALT LAKE )

 3            KENNETH R. WALLENTINE deposes and says:

 4                    That he is the witness referred to

 5   in the foregoing deposition; that he has read the same

 6   and knows the contents thereof; that the same are true

 7   of his own knowledge.

 8

 9            _____

10            KENNETH R. WALLENTINE

11

12

13      SUBSCRIBED AND SWORN to before me this_____day of

14   _____, 2014.

15

16

17            _____

18            NOTARY PUBLIC
              Residing in_____, Utah.
19

20   My Commission Expires:

21

22

23

24

25
```

```
1  STATE OF UTAH        )
                        ) ss.
2  COUNTY OF SALT LAKE )

3

4
        I, DANA MARIE KENNEDY, a Certified Shorthand
5  Reporter, Registered Professional Reporter, and Notary
   Public within and for the county of Salt Lake, State of
6  Utah do hereby certify:

7
        That the deposition of KENNETH R. WALLENTINE was
8  taken before me pursuant to notice at the time and place
   therein set forth, at which time the witness was by me
9  duly sworn to testify the truth;

10
        That the testimony of the witness and all
11 objections made and all proceedings had at the time of
   the examination were recorded stenographically by me and
12 were thereafter transcribed, and I hereby certify that
   the foregoing deposition transcript is a full, true, and
13 correct record of my stenographic notes so taken;

14      I further certify that I am neither counsel for
   or related to any party to said action in anywise
15 interested in the outcome thereof.

16
        IN WITNESS WHEREOF, I have subscribed my name
17 this 15th day of April 2014.

18
                        _____
19                      DANA MARIE KENNEDY
                        Certified Shorthand Reporter,
20                      Registered Professional Reporter,
                        and Notary Public in and for the
21                      County of Salt Lake, State of Utah.

22 My Commission Expires:
   August 2, 2014
23

24

25
```