UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:12-cv-00838-MOC-DSC

| | |
|---|---|
| VICTOR WILLIAMS AND TEMAKO MCCARTHY, as co-administrators of the Estate of La-Reko Williams, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| | ) MEMORANDUM OF DECISION ) and ORDER |
| Vs. | ) ) |
| OFFICER MICHAEL FORBES, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; AND CITY OF CHARLOTTE, | ) ) ) ) |
| Defendants. | ) |

**THIS MATTER** is before the court on Defendant City of Charlotte's ("the City") Motion for Summary Judgment (#50) and Defendant Officer Michael Forbes' ("Officer Forbes") Motion for Summary Judgment (#54). Having considered the defendants' motions, the plaintiffs' Responses, and the defendants' Replies, and having conducted an evidentiary hearing on the issue of qualified immunity issue, the court will grant the city's Motion for Summary Judgment and deny in part and grant in part Officer Forbes' Motion for Summary Judgment based on Qualified Immunity. Trial is reset for the August 2014 term.

**FINDINGS and CONCLUSIONS**

**I.    Background**

Plaintiffs contend that their decedent, La-Reko Williams ("Mr. Williams" or "decedent"), was killed by Officer Forbes, a police officer employed by the City, when such officer, without just cause, employed his Taser, striking the decedent's center mass, causing cardiac capture and death. They contend that such actions violated their decedent's rights under the Fourth

1

Amendment not to have excessive force employed in effectuating an arrest and have brought claims against Officer Forbes in his official and individual capacities. Plaintiffs further contend that the City should be held liable for Officer Forbes' actions based on a failure to train officers not to target center mass. Having discovered that the City *did* train officers to avoid center mass, plaintiffs have tacitly amended their theory by now asserting that the City's liability is based on its failure to train officers as to the medical reason underlying the training that a suspect's center mass should be targeted, to wit, possible cardiac capture and death.

Earlier in this litigation, the City filed a Motion to Dismiss for Lack of Jurisdiction, arguing that it was entitled to judgment as a matter of law because it provides CMPD officers with a program on the proper use of Tasers, including training that officers should avoid targeting a person's center mass. The magistrate judge recommended granting that Rule 12(b)(6) motion and objections were filed. After conducting a hearing on plaintiffs' objections, the court determined that while Rule l2(b)(6) requires that plaintiffs make plausible allegations that, if later proved, could result in a favorable jury finding, it was premature to determine under prevailing law whether plaintiffs had sufficient proof that the deficiencies in training they alleged amounted to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." City of Canton v. Harris, 489 U.S. 378, 388-89 (1989). Rather than grant the motion to dismiss, the court determined that any proof plaintiffs may have concerning failure to train can best be judged after the conclusion of discovery. Plaintiffs were advised that at summary judgment the court would look closely at whether they had evidence that city policymakers were on actual or constructive notice that a particular omission in their training program caused employees to violate citizens' rights, but that they chose to retain the

allegedly deficient program anyway. Connick v. Thompson, ___ U.S. ___, 131 S.Ct. 1350, 1360 (2011).

**II.     Pending Motions**

At the close of discovery, the City timely moved for summary judgment contending that no genuine issues of fact remained for trial on the issue of municipal liability and that it was entitled to judgment as a matter of law. Plaintiffs contend that while the City did train its officers to avoid center mass when employing a Taser, the City's failure to provide the officers with the medical reason behind such limitation amounted to a deficient training program. For the reasons discussed below, the court agrees with the City that municipal liability cannot attach and will grant summary judgment in favor of the City.

Defendant Forbes has moved for summary judgment contending that he is entitled to qualified immunity as there was no settled decision that prohibited targeting a suspect's center mass with a Taser at the time of Mr. Williams' death and that his actions were, in any event, objectively reasonable based on a totality of the circumstances face that night. For the reasons discussed below, the court finds that there is no requirement that there be "clearly established law" as to the limits of use of *a* particular device on an officer's utility belt; rather, in the context of a death caused by the application of a Taser, the requirement of "clearly established law" is met by employing the familiar "excessive use of force" standard. When that standard is applied, it is clear that Officer Forbes is entitled to the protection of qualified immunity as to his first use of the Taser inasmuch as Mr. Williams was undoubtedly non-compliant with lawful commands to stop. As Officer Forbes had time to reassess the situation in the 13 seconds between the first and second Taser shocks, that same excessive force standard is also applicable to the second and supposed third shocks (with the third being in drive-stun mode) after which application Mr.

Williams died. While Officer Forbes' evidence indicates that the second shock was applied to Mr. Williams because he was getting up and not obeying commands to lie down on his stomach, plaintiffs have presented evidence in the form on an eyewitness who testified that such shocks were administered when Mr. Williams was on the ground, attempting to comply, and no longer posing a threat to the officer. For the reasons discussed at greater length below, qualified immunity will not be granted as to the second and alleged third shocks as it appears that there is a genuine issue of fact as to whether such shocks were in fact applied while Mr. Williams was on the ground, a fact which is material to the qualified immunity and excessive force analysis.

## II.     Summary Judgment: Applicable Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a genuine issue for trial." Where the record taken as a whole could not lead a rational trier of fact to find for the non- moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis deleted) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby. Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return

a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id. at 252.

**III.    City's Motion for Summary Judgment**

In relevant part, plaintiffs assert § 1983 municipal liability claims against the City for excessive use of force and failure to train. In order for a Section 1983 claim of municipal liability to survive based on the alleged constitutional torts of City employees, plaintiffs must plausibly allege and now, on summary judgment, come forward with evidence upon which a reasonable fact finder could find that some municipal "policy" or "custom" caused a deprivation of their decedent's federal rights. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Put another way, Section 1983 liability can only attach where the City causes the constitutional violation itself, as there simply is no vicarious liability in Section 1983 proceedings. City of Canton, 489 U.S. at 385.

In Carter v. Morris, 164 F.3d 215 (4th Cir. 1999), the Court of Appeals for the Fourth Circuit provided four sources of "official policy or custom" that may give rise to municipal liability: (1) "written ordinances and regulations;" (2) "affirmative decisions of individual policymaking officials;" (3) omissions by policymaking officials "that manifest deliberate indifference to the rights of the citizens;" or (4) a practice "so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." Id. at 218 (citations omitted). The Supreme Court has held that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 131 S.Ct. at 1359. In this case, plaintiffs' claims seeking City liability under Section 1983 pivots on training.

Relevant to the Complaint and evidence proffered in this case, plaintiffs contend that the City has or had in place a *deficient* program of police training and supervision that resulted in the use of excessive force by untrained or improperly trained officers, all in violation of the Fourth Amendment. See Spell v. McDaniel, 824 F.2d 1380, 1387-88 (4th Cir. 1987). Plaintiffs allege that "TASERs are deadly weapons" and that the City has maintained a policy or custom of allowing and encouraging its police officers to use Tasers "in circumstances where deadly force was unjustified and less deadly uses of force should have been implemented." Complaint (#1) at ¶¶ 52 and 55. Plaintiffs also allege that the City failed to train its police officers in "the proper way to contain, treat and secure irrational persons such as Williams...the dangers of TASER ECD shocks... [and] the necessity of avoiding the targeting of TASER's towards a subject's chest and heart." Id. at ¶ 75.

In arguing that summary judgment should not be granted to the City, plaintiffs primarily contend that the City had a constitutional duty to change their Taser training concerning targeting the chest after a substantial jury verdict in this court was awarded in favor of the Estate of Darryl Turner and against Taser, a verdict which was, coincidentally, returned in this court one day before the death of Mr. Williams in this case. Plaintiffs have conceded that the City changed its Taser policy after Turner's death in 2008, teaching officers to avoid the chest when possible. Plaintiffs now contend that not only was the City required to train officers to avoid the chest area, they should have trained officers with the underlying reason for the change in training, to wit, that a center mass strike with a Taser can cause cardiac capture and death, knowledge which plaintiffs believe would have better equipped Officer Forbes and, perhaps, avoided Mr. Williams' death. Thus, it appears that plaintiffs are contending that the City was not just under a constitutional duty to change its training to instruct officers to avoid center mass, they were under a constitutional duty to provide officers with *better* training by providing a medical explanation to officers concerning why they should avoid deploying a Taser to the chest area. For purposes of summary judgment, the court has accepted as true the opinion of plaintiffs' expert, David King, that after Turner's death in 2008, the City could have provided better training by informing officers that the reason they were to avoid the chest was cardiac capture.

As a matter of law, plaintiffs' revised theory for imposing municipal liability is unsound. While the court liberally allowed plaintiffs to proceed to discovery on their original theory, their new basis for imposing municipal liability relies completely on hindsight and in no manner shows that policymakers were on actual or constructive notice *at the time* of this tragic incident that a particular omission in their training program caused Officer Forbes to allegedly violate Mr. Williams' rights and that with such knowledge they chose to retain the allegedly deficient

7

program anyway. See Connick 131 S.Ct. at 1360. Indeed, the decision in City of Canton, supra, could not be clearer that a city's failure to provide better or optimal training will not suffice:

> In resolving the issue of a city's liability [under a § 1983 failure to train theory] ... [n]either will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.

Id. at 391 (emphasis added). There is sound logic behind disallowing municipal liability under § 1983 based on Monday-morning quarterbacking: under both City of Canton and Connick , plaintiffs must show that at the time of Mr. Williams' death that the City was on notice that an omission in its Taser training program could have caused its officers to deprive citizens of federally protected rights.

Finally, plaintiffs also argue that their claims against the City survive summary judgment because it is the training program itself which is the "pattern" from which deliberate indifference can be discerned. To prove a pattern of deliberate indifference, plaintiffs must come forward with evidence of "[a] pattern of similar constitutional violations by untrained employees ...." Id. First, this theory fails because plaintiffs are unable to point to a pattern of deaths caused by untrained CMPD officers deploying Tasers. The only other death prior to the death of Mr. Williams was caused when an "untrained" CMPD officer used a Taser which caused the death of Darryl Turner in 2008. A single prior incident does not form a pattern that could support a finding of deliberate indifference. Carter, 164 F.3d at 219. Indeed, it is undisputed that the City did in fact change its training based on Mr. Turner's death. Second, plaintiffs' additional contention that there is evidence of a pattern of unconstitutional conduct because the training was "deliberately/ intentionally designed by policymakers" is equally flawed. This theory of

8

"intention design" would capture all training programs as the court simply cannot fathom any responsible training program in any field which is not the result of "intentional design." Such a theory appears to be a backdoor to plaintiffs' earlier theory that the City could have provided better training, which would again call upon a jury to speculate as to whether the City could have provided a better training program without regard for whether the City knew of the alleged deficiency. What is clearly required to get a claim of municipal liability to the jury is evidence of that at the time of the incident, the City knew or should have known its training program was deficient.

In sum, for municipal liability to attach, the issue squarely before the court is whether the City failed to train its officers to avoid the chest area when deploying Tasers, not whether that training could have been subjectively better. Here, Officer Forbes is the first <u>trained</u> CMPD officer whose actions resulted in the death of a suspect when a Taser was deployed to the suspect's chest. While it is certainly possible to establish a failure-to-train case based on a single incident, <u>Connick</u>, at 1361, this action does not present circumstances which would support a finding of a deficient training program based on one incident. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." <u>Id.</u> at 1360. Here, the evidence is not disputed that (i) the City did change its training in 2008 to teach officers to avoid the chest with Tasers when possible and (ii) the City has always trained its officers to use Tasers only when there is an "imminent physical threat." Even plaintiffs admit that the city did in fact provide such training, which ends the inquiry as the Supreme Court has set a "stringent standard" under <u>Connick</u>. Section 1983 does not seek to remedy every injury inflicted by a municipality or its employees as state tort law covers most of that ground; instead,

Section 1983 is a tool for enforcing compliance by those acting under state law who intentionally or through deliberate indifference violate federally protected rights of citizens. It is not a game of "gotcha" where municipalities are on the hook for damages simply because the training they provides employees could have been better. Finding that no genuine issues of material fact remain as to municipal liability, summary judgment will be entered in the City's favor dismissing such claims.

### IV. Officer Forbes' Motion for Summary Judgment: Qualified Immunity

#### A. The Protection Afforded by Qualified Immunity

Qualified immunity is not only an immunity from liability, but also immunity from the burdens of facing trial. Brown v. Gilmore, 278 F.3d 362, 366-67 (4th Cir. 2002) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). When considering a request for qualified immunity, the court considers the facts in the light most favorable to the party opposing granting judgment based on qualified immunity. Scott v. Harris, 550 U.S. 372, 378 (2007); Brown, 278 F.3d at 362 n. 2 & 366 n. 2. When faced with a motion seeking summary judgment based on qualified immunity, a court must decide whether, viewing the facts in the light most favorable to the plaintiffs, the defendant should prevail based as a matter of law on the asserted qualified immunity. Scott, 550 U.S. at 378. When there is a conflict as to material aspects of what occurred, "this [factual conflict] usually means adopting ... the plaintiff s version of the facts." Id.

#### B. Asserting Qualified Immunity at the Summary Judgment Stage

Where the defense is asserted in a motion to dismiss, determining qualified immunity does not require the court to engage in fact finding inasmuch as the inquiry is a "purely legal one: whether the facts alleged [in the Complaint] ... support a claim of violation of clearly

established law." Mitchell v. Forsyth, 472 U.S. 511, 528 n. 9 (1985). Where, as here, a defendant asserts qualified immunity at the summary judgment stage, the defendant may challenge the adequacy of the evidence to support the Complaint's allegations. Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009). Summary judgment on the issue of qualified immunity is only appropriate if a genuine issue of material fact does not exist as to the actions taken by the officer. Bostic v. Rodriguez, 667 F.Supp.2d 591, 607-08 (E.D.N.C. 2009).

### C. Facts Presented

As reflected in the pleadings and in the testimony and other evidence presented at the evidentiary hearing, the parties paint very different versions of what transpired *in advance* of Officer Forbes arriving at the scene. Taken in a light most favorable to the party resisting summary judgment, plaintiffs have presented evidence which, if believed, would paint Mr. Williams as the victim of an attack by his irate girlfriend who was simply attempting to defend himself from her blows at the Woodlawn light rail platform. When approached by Officer Forbes, plaintiffs' evidence presents Mr. Williams as exercising his right to walk away as Mr. Williams had no reason to believe he had done anything wrong and had no reason to obey Officer Forbes unlawful command to stop.

There is, however, no genuine issue of material fact as to what information Officer Forbes had when he arrived on the scene and deployed the Taser the first time, as that information was captured on dispatch recordings and on a recording made from the officer's body microphone ("DMVR") as to the exchange of words between Officer Forbes and Mr. Williams.

11

It is undisputed that Officer Forbes arrived on the scene after being dispatched based on citizen calls to 911 indicating that a man fitting Mr. Williams description was brutally beating a woman he had pinned to the ground at the Charlotte "Lynx" light rail station located at Woodlawn Road. The incident was dispatched to the officer as a "priority one" call. The evidence presented indicated that Officer Forbes saw Mr. Williams engaged in a "tussle" with the purported victim. When Mr. Williams saw Officer Forbes, it is undisputed that Mr. Williams started walking away from the scene, that he refused to stop when commanded to do so, that he cursed the officer, that Officer Forbes first warned him that if he did not stop he would be tased, that Mr. Williams responded in a manner indicating that he did not care, and that Officer Forbes then targeted decedent's chest area and successfully deployed his Taser, causing Mr. Williams to fall to the ground. It is also undisputed that Mr. Williams survived the first shock and Officer Forbes gave Mr. Williams further compliance commands to roll over on his stomach.

What happened after this point is in dispute for a number of reasons: first, Officer Forbes DMVR stopped recording immediately before the second shock was administered; and second, the alleged victim of Mr. Williams' assault has provided sworn testimony that materially conflicts with Officer Forbes account of what caused him to administer a second, apparently fatal, shock. While Officer Forbes put on evidence that 13 seconds elapsed before he administered a second shock and that, in the interim, Mr. Williams was attempting to rise up and not obey his command to assume a prone position, plaintiffs placed in evidence the video deposition testimony of "Ms. D."[1] She testified that after the first shock was administered, Mr. Williams fell to ground, could not comply with the commands to roll over because the Taser had incapacitated him causing him to foam at the mouth, and that the officer administered the second

---

[1] As this witness was allegedly the victim of a domestic assault which may or may not have resulted in her miscarrying a child, the court has determined it appropriate to protect her identity.

shock even though Mr. Williams remained on the ground. Plaintiff also presented forensic evidence in the form of the coroner's report finding that the cause of death was cardiac capture and which opined that Mr. Williams had markings on his body consistent with a drive-stun wound administered by a Taser, which would amount to a third shock administered by placing the barrel of the Taser directly against Mr. Williams.

### D. Discussion

In determining whether an officer is entitled to the protections of qualified immunity, a court considers two issues: (1) whether a constitutional or statutory right would have been violated on the facts alleged by the plaintiff; and (2) whether the right asserted was clearly established at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 200 (2001). If either inquiry is resolved in favor of the officer, qualified immunity applies. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Thus, qualified immunity analysis has two analytical "steps." First, a court asks whether, "taken in the light most favorable to [the plaintiffs] ... the facts alleged show [that Officer Forbes's] conduct violated a constitutional right." Saucier, 533 U.S. at 201. Second, the court asks whether the right alleged to have been violated was a "clearly established ... right[ ] of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Anderson v. Creighton, 483 U.S. 635, 638-39 (1987) (holding that "Qualified immunity is not lost when an officer violates the Fourth Amendment unless a reasonable officer would know that the specific conduct at issue was impermissible."). If either answer is "no," the officer is entitled to the protections of qualified immunity.

In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court held that the qualified-immunity analysis need not proceed in the sequence set forth in Saucier, and that "[t]he judges of

the district courts and the courts of appeals [may] exercise their sound discretion in deciding which of the two prongs ... should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S.Ct. at 818. In light of the circumstances of this case, the court will address the second inquiry first.

### 1. Existence of Clearly Established Law

The court's first inquiry is whether the right plaintiffs' assert was clearly established at the time of the incident. Most recently, the Supreme Court held, as follows:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "'clearly established'" at the time of the challenged conduct.

Ashcroft v. al-Kidd, 563 U.S. ___, ___, 131 S.Ct. 2074, 2080 (2011). A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating that right. Id., 131 S.Ct. at 2083-84. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." Id.

Here, Officer Forbes argues that there is no clearly established right which plaintiffs can assert concerning Taser use. While that is a correct statement, the Fourth Circuit has held that "[w]e do not require a case directly on point in order to conclude that the law was clearly established," but only that "existing precedent must have placed the statutory or constitutional question beyond debate." Smith v. Gilchrist, 749 F.3d 302 (4th Cir. 2014) (citation and corresponding quotation marks omitted). Plaintiff is quite correct that there is no case that specifically holds that an officer violates a citizen's Fourth Amendment protections by targeting the chest or repeatedly tasing someone. Such lack of authority does not, as a matter of common sense, allow police officers to employ the Taser or any other device (such as a nighstick,

blackjack, Mag Lite, or pepper spray) with impunity, but is instead attributable to the Supreme Court's admonition that the lesser courts "not …. define clearly established law at a high level of generality," id., at 2074, since doing so avoids the crucial question, which is whether the officer acted reasonably in the particular circumstances that he or she faced. Plumhoff v. Rickard, __ U.S. ___, 134 S.Ct. 2012, 2023 (May 27, 2014). Instead,

> analysis of an excessive force claim brought under § 1983 begins with 'identifying the specific constitutional right allegedly infringed by the challenged application of force.'

Orem v. Rephann, 523 F.3d 442, 445 (4th Cir.2008) (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)), *overruled on other grounds*, Wilkins v. Gaddy, 559 U.S. 34 (2010). Thus it is the constitutional right that is the key inquiry, not the means used in supposedly violating that protection.

In sum, the court agrees with defendants that there is no clearly established case law that prohibits the use of a taser, the targeting of the chest area, or the repeated use of a Taser to enforce a police officer's order to "stop." Courts that have addressed this emerging issue have found, "[n]o decision from the United States Supreme Court, or from this Court, or from the Florida Supreme Court, has clearly established that an officer's repeated use of a Taser constituted excessive force under circumstances like these." Oliver v. Fiorino, 586 F.3d 898, 907 (11th Cir. 2009). However, what is clearly established is that "suspects have the right to be free from tasing where they are fully compliant with officers' orders, not resisting arrest, or immobilized and posing no threat of danger." Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir.2012) (emphasis added). Indeed, Officer Forbes appears to be in full agreement with such proposition. Thus the question is not whether there is a bright line as to Taser use, as the Complaint suggests, but whether the officer's actions on the night in question,

when viewed from the perspective of a reasonable officer on the scene, amounted to an appropriate use of force under a totality of the circumstances.

In evaluating the reasonableness of a particular use of force, courts consider "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "[T]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.[2]

The court finds that the second prong has been satisfied as the law is clearly established that an officer cannot effectuate a stop through the use of excessive force regardless of the means or instrumentality used to stop the suspect.

### 2. Conduct Which Could Have Violated the Identified Right

At the summary judgment stage, the first prong asks whether the evidence, when taken in the light most favorable to the plaintiffs, presents plausible facts which lead a fact finder to determine that the officer's conduct violated the identified constitutional right. In this case, there are least two distinctive deployments of the Taser, each of which requires analysis under the first prong.

#### a. The Initial Stop

---

[2] It is worth noting that plaintiff's argument that the City's own policy was violated when Officer Forbes targeted Mr. Williams's chest area is not the equivalent of "clearly established law." In other words, even if Officer Forbes decision to target the decedent's chest is considered to be a violation of city policy, such fact does not satisfy the first inquiry of the qualified immunity analysis. The Supreme Court has long held that officers "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." Davis v. Scherer, 468 U.S. 183, 194 (1984); *see also* Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir.2006) (holding that "the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established."); Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir.2003) (holding that "§ 1983 protects plaintiff from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices.").

16

Despite some compelling eyewitness testimony to the contrary from disinterested third-party witnesses, plaintiffs' version of events has Mr. Williams as the victim of a domestic dispute, not the aggressor, their decedent not struggling with the officer, and then walking away when the officer attempts to stop him regarding the incident. What is material when considering whether qualified immunity applies to the initial stop is whether Officer Forbes had a reasonable, articulable suspicion upon which to stop Mr. Williams and whether Mr. Williams refused to obey that command. As discussed below, Officer Forbes clearly had a lawful reason to stop Mr. Williams and even plaintiffs' evidence has Mr. Williams failing to obey the command to stop.

While plaintiffs argue that their decedent had an absolute right *not to talk* with officers under the Fifth Amendment, their argument that defendant had the right *to walk away* is without legal foundation. While the court agrees with plaintiffs that a citizen has the constitutional right to walk away from a law enforcement officer who lacks probable cause or a reasonable suspicion to detain or seize his or her person, such as where an officer shows up at a person's front door without a warrant to do a knock-and-talk, Kentucky v. King, ___ U.S. ___, 131 S.Ct. 1849, 1862 (2011), it is clear that at the time of the initial encounter Officer Forbes had a reasonable, articulable suspicion that Mr. Williams had just engaged in criminal activity, justifying his attempted stop of Mr. Williams. Such evidence included the transcripts of the information conveyed to Officer Forbes by dispatch and Officer Forbes' DMVR recording and his own observation of Mr. Williams "tussling" with a person he perceived to be the victim of a violent domestic attack. Based on a totality of the information, Officer Forbes had reason to believe that Mr. Williams was involved in a serious domestic assault in a public place. See United States v. Place, 462 U.S. 696, 702 (1983). Officer Forbes had, therefore, a reasonable, articulable

suspicion that criminal activity had occurred and that Mr. Williams had been involved in that activity, justifying a Terry stop of Mr. Williams in furtherance of his investigation.

It is also undisputed that Mr. Williams failed to obey Officer Forbes' lawful commands to stop. "To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." Rowland v. Perry, 41 F.3d 167, 172 (4th Cir.1994). "Subjective factors involving the officer's motives, intent, or propensities are not relevant." Id. at 173. While the court has fully considered plaintiffs' evidence concerning the events leading up to the first deployment of the Taser, "the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question," id., not those of the suspect or even bystanders. Indeed, plaintiffs' conclusion that Mr. Williams believed Officer Forbes' had no right to stop him is without significance in this inquiry.

Based on a totality of the circumstances, it is clear that when he first deployed his Taser after Mr. Williams refused to stop, Officer Forbes was faced with a person he perceived, rightly or wrongly, who had just been involved as the perpetrator of a violent assault against a female and had seen firsthand the suspect engaged in a "tussle" with that victim. Further, he had information from dispatch that the male was the perpetrator. He further observed that the Mr. Williams refused to obey his commands to stop. While plaintiffs deny such occurred, the officer perceived that decedent had either pushed him or resisted his attempt to stop him by laying hands on him.

When considering whether this officer's decision to deploy the Taser was objectively reasonable, the evidence clearly points to the officer's proper use of what is typically a non-lethal device to gain compliance with a lawful command to stop which a suspect has refused to obey.

While this analysis is accomplished through the perceptions of the officer on the scene, the question is not whether this officer believed his actions were lawful, but rather whether it would be clear to a reasonable officer in this officer's position that the actions taken would be lawful. Clem v. Corbeau, 284 F.3d 543, 552-53 (4th Cir. 2002). The court finds that it would be and will grant Officer Forbes' request for qualified immunity as to the first deployment of the Taser.

### b. The Subsequent Application of Force

The second and, perhaps, third, applications of the Taser present a more difficult question. While the court again applies the reasonable officer analysis to the actions taken, plaintiffs have come forward with evidence in the form of testimony from Ms. D that calls into question whether Mr. Williams was attempting to get up at the time of the second application of the Taser. Where there is a genuine issue as to whether the suspect was still resisting, attempting to get up, or refusing to comply – which are all important, material considerations under Graham, supra -- the court must accept plaintiff's version of what occurred unless such evidence is implausible. Romo v. Largen, 723 F.3d 670, 674, 675 n. 2 (6th Cir.2013). Thus, once plaintiffs come forward with such evidence, the burden shifts back to Officer Forbes to show that the testimony of Ms. D is implausible, which has not been accomplished in this case. Indeed, the fact that Officer Forbes' DMVR cut off immediately before the second application of the Taser, while certainly subject to innocent as well as culpable explanation, does nothing to assist Officer Forbes in establishing Ms. D's version of events as implausible. Taking such evidence in a light most favorable to plaintiffs, which if true could suggest to a jury that Mr. Williams was tased for no-valid law enforcement purpose, a reasonable officer would not under the totality of those circumstances believe that it would be reasonable to apply a Taser for a second or a third time in drive-stun mode. The court will, therefore, deny qualified immunity

based on the second and possibly third applications of force as a genuine issue of material fact remains for trial.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Defendant City of Charlotte's Motion for Summary Judgment (#50) is **GRANTED** and the City is dismissed as a party to this action.

**IT IS FURTHER ORDERED** that Defendant Officer Michael Forbes's Motion for Summary Judgment (#54) based on Qualified Immunity is **GRANTED** as to his first application of the Taser, but is **DENIED** without prejudice as to his second and possible third applications as it appears that a genuine issue of material fact remains for trial as to whether Mr. Williams was immobilized at that time.

This matter is set for trial during the August 2014 trial term.

Signed: July 18, 2014

Max O. Cogburn Jr.
United States District Judge